MENTE & CO., Inc., et al. v. ISTHMIAN S. S. CO.

Petition of COURT LINE, Limited.

THE QUARRINGTON COURT.

Nos. 117—305, 117—350.

District Court, S. D. New York.

Nov. 25, 1940.

See, also, 25 F.Supp. 665.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, Henry N. Longley, and John W. R. Zisgen, all of New York City, of counsel), for libelants and cargo claimants.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. deGrove Potter and Joseph W. Whelan, both of New York City, of counsel), for Isthmian S. S. Co.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin, Wharton Poor, and Charles S. Haight, Jr., all of New York City, of counsel), for petitioner.

COXE, District Judge.

This litigation grows out of the sinking of the British steamship "Quarrington Court" in the Red Sea on December 7, 1937. The disaster was caused by the flooding of the vessel following a break in the main injection pipe and the concurrent jamming of the main injection valve.

The vessel was owned by Court Line, Ltd., an English corporation, and was under charter to Isthmian Steamship Corporation, a Delaware corporation. She was on a voyage from Calcutta to ports in the United States with a cargo of manganese ore, jute, burlap and Hessian cloth. As a result of the sinking the vessel and the entire cargo became a total loss.

The litigation consists of (1) an admiralty suit brought by cargo owners and underwriters against Court Line, Ltd., and Isthmian Steamship Company to recover $439,587.41 for cargo loss; and (2) a limitation proceeding instituted by Court Line, Ltd., for exoneration from or limitation of liability. In the cargo suit, Isthmian Steamship Company has filed a cross-petition against Court Line, Ltd., claiming indemnity in the event that it should be found liable to the cargo claimants. The cargo claimants have filed claims in the limitation proceeding and challenged the right of Court Line, Ltd., to exoneration as well as limitation. Isthmian Steamship Company has similarly reasserted in the limitation proceeding its claim against Court Line, Ltd., for indemnity; it has, in addition, made a further claim against Court Line, Ltd., for $75,260 for lost freight, and has denied the right of Court Line, Ltd., to limitation of any of the Isthmian claims.

The cargo suit and the limitation proceeding were tried together, and will be disposed of in one opinion. In the subsequent discussion, the cargo owners and underwriters will be referred to as "Cargo", Court Line, Ltd., as "Owner", and Isthmian Steamship Company as "Isthmian".

The "Quarrington Court" was a shelter deck vessel with five lower holds, three

forward of the machinery space and two aft. She had a gross tonnage of 6,900 tons; was 434 feet 11½ inches long, 56 feet 6 inches beam, and 28 feet 4½ inches in depth; and she had triple expansion reciprocating engines.

The vessel and the engines were built in England, under Lloyd's supervision, by concerns of the highest standing. The construction was completed in November, 1928, and the vessel at once received the highest class rating, which she maintained until her loss in 1937. She was always kept in good repair, and regularly passed her periodic surveys.

The main injection pipe was in two sections, each constructed of a sheet of copper with a thickness of .128 of an inch, rolled into a circle and lapbrazed. The two sections were joined by a flange. The pipe ran from the main injection valve athwartships to the circulating pump—a distance of about 13 feet. In the outboard section there was a bend with an expansion joint, which gave the pipe added flexibility. The pipe was 12 inches in diameter, and rested on chairs fastened to the tank top. It was made by the same concern which built the engines, and was standard in design, material and manufacture. It was about nine years old, and had never given any trouble. The witnesses on both sides were agreed that such a pipe usually lasted the life of the ship. There was testimony also from the surveyors that they rarely ever renewed such a pipe, and had never known one to open in the way this one did.

The main injection valve was also constructed by the same concern which built the engines. The outer casing was of cast iron and was attached to the shell plating. The valve proper consisted of a valve lid, a valve seat and a spindle. The valve lid was 12 inches in diameter, was made of gun metal, and had four wings which served to guide the valve lid into place in the valve seat. The valve lid was forced up and down by means of the spindle, which was threaded and worked in a horseshoe on the upper face of the valve lid. It required 11 turns of the spindle to open the valve fully. Such valves frequently last the life of the ship.

The valve lid on the "Quarrington Court" passed its first four-year survey in 1932. In December, 1934, the vessel was drydocked at Cardiff, and a new valve lid and a new spindle were installed by Mountstuart Drydocks, Inc. The valve lid was renewed at that time because of leakage, and the work was done under Lloyd's supervision. In February, 1936, the vessel was again drydocked at her second periodic survey at South Shields, and a complete new valve lid was installed under Lloyd's supervision by Brigham & Cowan, Ltd. This new valve lid was required because the surface of the mitre had become marked or scored. Both Mountstuart Drydocks, Inc., and Brigham & Cowan, Ltd., were shown to be ship repairers of high standing.

There is one other part of the vessel which needs description. This is the strainer plate through which the water flows into the main injection valve chest. This plate was rectangular in shape, its dimensions were about 24 by 14⅜ inches, and it was located on the port side about 150 feet from the stern and above the line of the bilge keel. It was secured to the shell plating by bolts, and was recessed about ¾ of an inch inside the line of the shell plating. It was about ¾ of an inch thick, and had oblong slots. Its lower edge was 2 feet 9 inches above the base line of the ship. The plate was originally made of brass, and although there is some uncertainty as to whether a different type was later installed, I think it is highly probable that the original plate remained. There was testimony that when the vessel was drydocked in May, 1937, the plate was given a visual examination and found to be in good condition.

The charter-party under which the vessel was chartered to Isthmian was entered into at London on July 28, 1937. It is on the usual "government form" of time charter, and charters the vessel for "one Far Eastern round voyage including India via U. S. A. and/or Gulf and/or Suez and/or Panama and/or Cape of Good Hope". It states that the vessel is "tight, staunch, strong and in every way fitted for ordinary cargo service", and there is a maintenance clause providing that the owner will "keep the steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service". It further provides that the owner is to continue in possession, operate and control the vessel; that nothing in the language shall be construed as a demise; that the captain shall "sign Bills of Lading for cargo as presented, in conformity with Mates' or Tally Clerks' receipts"; that disputes shall

be referred to arbitrators in London; and that the charter "is subject to all the terms and provisions of and all the exemptions from liability contained in the Carriage of Goods by Sea Act of the United States approved on the 15th April 1936". 46 U.S.C.A. §§ 1300–1315. With respect to this last quoted language, the original shows some words of the printed form crossed out and the insertion in handwriting in the margin of "Carriage of Goods by Sea Act" and "15th April 1936".

The vessel was delivered to Isthmian under the charter at Liverpool on July 31, 1937. From Liverpool she proceeded to Mobile, arriving there on August 18, 1937. She remained at Mobile until August 29, 1937, when she sailed for Japan with a cargo of steel products.

The vessel went aground on October 10, 1937, at 8:49 P. M., as she was entering the port of Yokohama. The sea at the time was dead calm, the vessel was running at reduced speed of 4 or 4½ knots, and she brought up gently without any bumping or shock. Prior to the strand, the draft was 24 feet 6 inches forward and 25 feet 6 inches aft. The engines were at once placed full astern but the vessel moved forward about a quarter of a mile before coming to rest. Soundings were then taken around the vessel and showed that there was 22 feet of water forward and 23 feet 5 inches aft. The engines were continued full astern in an effort to free the vessel, but this proved unavailing.

On the following morning, October 11th, the vessel's Yokohama agent came out with McGlashan, Lloyd's surveyor, and Warkman, the representative of the London Salvage Association. Warkman thereupon took a large number of soundings around the vessel and for a quarter of a mile aft. These soundings in general verified the soundings taken on the previous evening; they showed, also, that the bottom was uniformly level and consisted of mud and sand. Warkman testified that the soundings indicated that the vessel was embedded only "between three inches to five inches".

The vessel remained aground for three and a half days, and during that time the engines, the anchors and two attending tugs were used in various attempts to get her off the strand. In the meantime, the work of removing part of the cargo was progressing. Finally, on the morning of October 14th, after about 2,000 tons of cargo had been discharged, the vessel was freed and proceeded to Yokohama.

While the vessel was on the strand she remained upright without any motion or pounding. There was no indication that she was or had been under any strain. Internal soundings were taken twice a day, and at no time showed any leakage. These soundings were continued after the vessel floated without finding any leaks. It was not even necessary during or after the stranding to operate the pumps.

Cargo makes much of the fact that after the grounding it was discovered that eight out of ninety-six holding down bolts were loose and a small area of cement in the port engine room was slightly set up. I can see nothing in these discoveries to suggest injury to the vessel. It is not uncommon to find holding down bolts loose after a long voyage, and they are usually attended to as part of the ordinary routine. The testimony regarding the cement was that it was neither cracked nor broken, but merely raised up about an inch, and had the appearance of being caused by a rust blister. Buchan, the chief engineer, testified that the area involved was "about eight inches"; Orr, the second engineer, that it was "about 2 feet 6 inches to 3 feet".

After the vessel was released from the strand, and while she was lying afloat off Yokohama, a diver examined the rudder, stern post and propeller, and found them undamaged. Warkman did not think that any further examination by the diver was required. Neither could he see any necessity for drydocking the vessel. Warkman had previously made a careful inspection of the vessel, and felt that no injury had been sustained. His opinion in this respect was shared by McGlashan, Lloyd's surveyor. Both Warkman and McGlashan were surveyors of long experience and unquestioned competence. Accordingly, on October 15th, McGlashan issued a certificate recommending that the vessel be "continued as classed without fresh record of survey subject to being examined in drydock at the owner's convenience". This is the usual form of certificate deferring drydocking to the owner's convenience; it was subsequently approved by Lloyd's committee in London.

From Yokohama the vessel proceeded to Osaka, and thence to Moji, where she arrived on October 20th. At both Osaka

and Moji portions of the cargo were unloaded, and at Moji some incidental machinery repairs were made. The vessel sailed light from Moji on October 25th, and arrived at Calcutta on November 10th. There is testimony that during this voyage a rattling or chattering noise was heard coming from the main injection valve.

The cargo involved in the present litigation was taken on at Calcutta and the bills of lading were issued there. These bills of lading were on Isthmian's regular forms, with headings featuring "Isthmian Steamship Lines", "Isthmian Steamship Company" and "The Angus Co., Ltd.", the latter being Isthmian's agent in Calcutta. They incorporated by reference the United States Carriage of Goods by Sea Act, and were signed by the Angus Co., Ltd., followed by the words "agents for Master".

The vessel sailed from Calcutta on November 16th, and experienced no difficulty until December 7th. At about 7:53 A. M. on that day, Orr, the second engineer, noticed a small spurt of water coming from a slight longitudinal split about six inches long and a fraction of an inch wide in the main injection pipe. Orr said that the split was in about the 4 or 5 o'clock position on the pipe, and about four feet from the circulating pump. He also said that he immediately reported the leak to Buchan, the chief engineer, who was then on deck waiting to go to breakfast. Buchan testified that Orr told him the leak was not serious, and that he advised Orr to have breakfast and then make some metal bands to go around the pipe.

Orr finished breakfast about 8:15, and then asked Coffey, the third engineer, to assist him in cutting metal binding strips. Orr thereupon returned to the engine room, and, after measuring the pipe, started to cut the metal strips. While he was so engaged, Buchan, the chief engineer, appeared and found that the split had increased to about "9 inches long and about 4 or 5 inches wide." Buchan testified that the split was about two feet from the circulating pump and in the 5 or 7 o'clock position on the pipe. Before the metal strips could be cut, and at about 8:30, the pipe gave way entirely, first opening to about a foot or 18 inches in length and 6 inches in width, and soon afterwards to about 4 feet in length and 10 inches in width. The split appeared to be right on the brazing.

With this condition confronting them, the engineers tried for the first time to close the main injection valve, which was then wide open, and found that they could only close it a turn and a half; later, by using a wheel spanner they were able to force it down another turn and a half. In the meantime, efforts were made to wrap the pipe with canvas and wood. These efforts were, however, unsuccessful, and the water, after flooding the machinery space, reached the shelter deck space, and from there found its way into the lower holds.

Taylor, the chief officer, who had been working with some of his own men in an attempt to bind the pipe, abandoned the work at 9:25 A. M. and reported to the master that the situation was serious. At 9:27 an S. O. S. was sent out. This was answered by the S. S. President Doumer, which soon afterwards arrived in the vicinity and undertook to take the vessel in tow. The tow line was made fast "somewhere about 11 o'clock" but it carried away at 12:30 P. M. after the vessel had gone only a short distance. In the meantime, there had been a suggestion that a tarpaulin be put over the side to cover the opening to the valve chamber, but aside from preliminary preparation no attempt was made in that direction. The vessel was abandoned at about 7 P. M. and sank at about 11:12 P. M.

Before taking up the legal questions, it is necessary to find some explanation for the disaster. Cargo seeks to find this explanation in the stranding off Yokohama. It first insists that the pipe broke either (1) because it was worn thin by erosion resulting from the passage through it of sand and gravel while the vessel was aground, or (2) because it was weakened by the vibration of the engines during the operations on the strand. I do not think that either of these contentions is tenable. There was only a comparatively small amount of sand and gravel passing through the pipe while the vessel was aground, and it is inconceivable that it would have had any appreciable effect on the part of the pipe where the break occurred. With respect to the vibration, the evidence is clear that it was not excessive. Moreover, the pipe was designed to take up vibration, and it is reasonable to suppose that any weakness from such a cause would have first developed at the flange, where the

pipe was held rigidly, and not in the body of the pipe.

Cargo then says that the valve jammed because it was clogged by a foreign object thrown up through the main injection chamber. The argument assumes that the strainer plate was broken or torn off during the stranding. It presupposes, also, that the foreign object which caught in the valve entered through the main injection opening and lodged between the valve seat and valve lid. There is, however, nothing to indicate that the strainer plate was broken or torn off during the stranding. The bottom where the grounding occurred was level, the vessel came to rest without bumping or shock, and there was no sign of any dislocation or of injury to the shell plates. It is doubtful also whether the strainer plate was ever in contact with the bottom; its lowest point was 2 feet 9 inches above the base line; it was recessed about ¾ of an inch from the shell plating; and the vessel was embedded only about 3 to 5 inches after coming to rest. On this showing, I find that the strainer plate was neither broken nor torn off during the stranding, which disposes of the contention that a foreign object caught in the valve.

The weight of the expert testimony was that the pipe and the valve both failed because of latent defects. The pipe was only about nine years old and had a number of years of useful life ahead of it. It had never leaked or given trouble. Tour, a consulting metallurgist with considerable experience, testifying as an expert for the Owner, was of the opinion that the braze had some initial latent defect which became aggravated as a result of dezincification from salt water, and that the pipe failed for that reason. I think this opinion is supported by the evidence. The trouble with the valve is more difficult to account for. Three theories were advanced for its failure, namely, (1) that the valve was clogged by some foreign object; (2) that the valve seat pulled out; and (3) that one of the wings of the valve lid broke. The first of these may be disregarded in view of the finding I have made that the strainer plate was neither broken nor torn off during the stranding. The experts considered both of the other theories possible, but were of the opinion that the breakage of one of the wings was the more probable of the two. I am of the same opinion. The valve seat could not

have pulled out unless the pin holding the seat in place had broken. There was, however, no strain on the pin, and it is unlikely that it broke. This was not true of the wings, for when the pipe burst the onrush of the water placed a great and sudden strain on them, which may well have caused a defective wing to break. I think, therefore, that the most plausible explanation for the valve failure is that one of the wings was latently defective, and broke when it was subjected to the unusual force of the water following the bursting of the pipe.

 The first question is whether the bills of lading issued at Calcutta are binding on Isthmian. These bills of lading are on Isthmian's regular forms, and bear the signatures of the Angus Co., Ltd., over the words "agents for Master". The Angus Co., Ltd., was Isthmian's agent at Calcutta, and had been authorized in writing by Captain Hurst, the master, to sign the bills of lading on behalf of the vessel; it had in fact attended to the detail work of clearing the shipments for Isthmian. Moreover, the issuance of the bills of lading had been preceded by freight contracts entered into by Isthmian in the United States covering more than 90% of the cargo. Under these circumstances, it cannot be doubted that the bills of lading were binding not only on the vessel and the Owner but on Isthmian as well. Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770; Gans S. S. Line v. Wilhelmsen, 2 Cir., 275 F. 254; The Capitaine Faure, 2 Cir., 10 F.2d 950; The Poznan, D.C., 276 F. 418.

 The next question is whether due diligence was exercised with respect to the pipe and valve. The Carriage of Goods by Sea Act provides that the vessel shall not be liable for unseaworthiness "unless caused by want of due diligence"; it also specifically exempts the vessel from liability for "latent defects not discoverable by due diligence." 46 U.S.C.A. § 1304. The vessel was clearly unseaworthy as to the pipe and valve. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; The Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L. Ed. 688. I have found also, that the failure of both of these parts resulted from latent defects. In order, therefore, to obtain exemption, the vessel is required to show that due diligence was exercised, and the burden is on the vessel to make this proof. Carriage of Goods by Sea Act, 46 U.S.C.A. §

1304. It is well settled, too, that the duty to exercise due diligence is not delegable. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 225, 21 S.Ct. 591, 45 L.Ed. 830; The Manitoba, D.C., 104 F. 145, 159.

■ In view of the findings already made, it is unnecessary to dwell further on the stranding off Yokohama. I do not believe it had any relation whatever to the disaster. I think, also, that the inspections at Japan were entirely adequate, and satisfied the requirements of due diligence up to that point. See The Floridian, 2 Cir., 83 F.2d 949. The remaining discussion will be devoted to the rattle or chattering noise which was heard on the voyage from Moji to Calcutta.

The testimony of Orr, the second engineer, was taken by deposition in London. He said that after leaving Calcutta he heard a rattle in the main injection valve, which sounded plainer on the deck than down below; he heard this rattle on the voyage from Moji to Calcutta at "intermittent periods" but "nothing like on the voyage from Calcutta, not to any extent". Orr also said that on the voyage from Moji to Calcutta the "tapping" was "only at intervals", and that he did not mention it to anyone prior to the arrival of the vessel at Calcutta, nor did anyone mention it to him. Orr could not recollect that he had heard the "tapping" on the voyage from Mobile to Japan.

Buchan, the chief engineer, testified that the tapping of the valve dated from about 1933, and that he reported it at about that time to the marine superintendent in England. In 1934 the valve was renewed because it leaked. It was again renewed in 1936 because the mitre had become scored. The work on both of these occasions was done by competent shipyards under Lloyd's supervision. Thereafter the rattle continued, but generally only when the valve was about 5 turns open; it was not present at two turns nor when the valve was wide open. Buchan described the rattle as "a quick rattle, like somebody tapping the ship's side with a hammer." He controlled it entirely by opening the valve wide. Coffey, the third engineer, who joined the vessel in May 1937, described the noise as a sort of a chatter, "like a telegraph going"; he said it was "more or less continuous" since July 1937, and came "at approximately five turns" of the spindle. Bell, the fourth engineer, who joined the

vessel in February 1937, testified that he first noticed the "clatter" in the valve after the vessel left Calcutta.

■ There was nothing abnormal in the rattle or chattering of the valve which the engineers heard before Calcutta. It came undoubtedly from the working of the spindle in the horseshoe where the connection was necessarily loose. The noise was one commonly heard with a reciprocating pump, and resulted from the fluctuations of the water pressure when the valve was nearly in equilibrium. It was not a new noise on the "Quarrington Court" but had existed for a number of years. It had always been controlled by adjustment. I cannot find anything, therefore, to indicate that the vessel should have been drydocked or the valve opened at Calcutta. It follows that due diligence was exercised with respect to the valve.

The claim of Isthmian for $75,260 for lost freight remains for consideration. Part of the cargo on the vessel consisted of manganese ore consigned to Carnegie Steel Company, which, like Isthmian, was a subsidiary of the United States Steel Corporation. The bill of lading covering the manganese ore recites that the shipment consisted of "a quantity said to be (7526) Seven thousand five hundred and twenty six tons Oriental manganese ore more or less * * *". One of the printed provisions reads: "Freight for the said goods to be paid at destination before delivery in cash without deduction as arranged, ship lost or not lost". There is also a stamped provision reading: "Freight payable at destination on outturn weight".

Isthmian sent freight bills to all of the importers of the cargo except two who had paid freight in advance, and these bills were all paid after the vessel was lost. The amount paid by Carnegie was $75,260. Later, Carnegie raised some question that the freight had not been earned, and the full amount of $75,260 was refunded by Isthmian. Isthmian now seeks to recover the amount of the freight from the Owner as damages.

It may well be doubted whether the decision of Isthmian to refund the freight was correct, even though the freight was not prepaid. See National Steam Nav. Co. v. International Paper Co., 2 Cir., 241 F. 861; The Gracie D. Chambers, 2 Cir., 253 F. 182, affirmed 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318. It is not necessary, how-

ever, to decide that question, for irrespective of whether the refund was proper or not, it is clear that there can be no recovery by Isthmian against the Owner.

The charterparty between Isthmian and the Owner incorporated by reference the U. S. Carriage of Goods by Sea Act, and this addition to the printed form was made in handwriting in the margin. I know of no good reason why this provision should not be given effect insofar as Isthmian's present claim is concerned; it meant that the obligation to Isthmian with respect to claims based on cargo shipments was the same as that owed to holders of bills of lading governed by the Carriage of Goods by Sea Act; and it still allowed some scope to the warranty of seaworthiness contained in the charterparty. The Westmoreland, 2 Cir., 86 F.2d 96. I hold, therefore, that the Owner is entitled to exemption from liability on Isthmian's claim for the reasons already given with respect to the claims of Cargo.

With this disposition, it is unnecessary to consider the various other contentions made by the parties.

There may be decrees dismissing the libel of the cargo owners and underwriters and the cross-petition of Isthmian Steamship Company, and exonerating Court Line, Ltd., from liability to any of the claimants; all with costs.