## PIONEER IMPORT CORPORATION v. THE LAFCOMO et al.

District Court, S. D. New York.

March 31, 1943.

Iselin, Riggs, Ferris & Mygatt, of New York City (George C. Sprague, Morris D. Ferris, and H. C. Archibald, all of New York City, of counsel), for libelant.

Tompkins, Boal & Tompkins, of New York City (Arthur M. Boal, of New York City, of counsel), for claimant.

Hunt, Hill & Betts, of New York City (John W. Crandall and Earle H. Houghtaling, Jr., both of New York City, of counsel), for respondent.

LEIBELL, District Judge.

Libelant brings this action in rem against the S. S. "Lafcomo", owned by the claimant, and against the respondent in personam as the operator of the steamship under a time charter from claimant. The action is for damages (in excess of $62,000) to a shipment of 1,847 cases and 20 bundles of 4 cases each of lily of the valley pips carried from Rotterdam to New York in November-December, 1939. The Bill of Lading was in the usual form of the respondent, a common carrier, and bore the stamped notation: "Shipped on deck at shipper's risk." When the shipment arrived in New York the pips were so badly damaged by sea water that they were worthless commercially and libelant sustained a total loss.

The arrangement for the shipment on the "Lafcomo" was made on November 25, 1939. The principal issue in this case is what was the agreement made by the libelant and the respondent, acting through their respective agents at Rotterdam, as to the place and manner of the stow. Employees and managers of the foreign agents testified through depositions, taken in question and answer form. The libelant's shipping agent was Van Es & Co.; the respondent

was represented by Van Nievelt, Goudriaan & Co., who in turn employed stevedores, Thomsen's Havenbedrijf, all of Rotterdam, Holland.

Libelant's agents testified that when the shipping space was engaged, it was understood that the cases of lily of the valley pips were to be carried on the forward deck and were to be covered with tarpaulins. The respondent admits that the original request for space was in that form but asserts that later, after some discussion over the telephone, the libelant's agents withdrew the request that the cases be covered with tarpaulin but held to their demand that the shipment be carried on the foredeck. Below deck space, between decks under the forward hatches, was offered libelant's agents and was refused. The cases were stowed on the plating of the forward deck in the wings of the hatches. The shipment was in good order and condition when received on board. No covering of any kind was placed over the cases. In a North Atlantic crossing in the first half of December the "Lafcomo" ran into weather such as is experienced at that time of the year—strong winds and high seas, some of which came aboard on the forward deck. The shipment of lily of the valley pips was thoroughly soaked by the salt water.

I have concluded that the agreement of the parties contemplated stowage of the cases on the forward deck, properly covered by tarpaulins. The shippers wanted the cases in a cool place and protected from the sea water. The testimony of libelant's witnesses is supported by the notation on the loading permit which libelant's agents, Van Es & Co., prepared and delivered with the cases to the stevedore employed by respondent. That notation on a contemporary document, delivered by the shipper's agent to the carrier's representative and accepted by him, was never changed. The question arises—if the respondent agreed to those conditions, why did it fail to comply with them? Probably the answer is that neither on the ship nor at the respondent's dock did they have the tarpaulins necessary to cover this deck cargo. The ship had only three spare hatch tarpaulins. The arrangement for the shipment was made Saturday, November 25, 1939, about 1 P. M. When the deck cargo (except 167 cases) was brought alongside the "Lafcomo" pier on a lighter that same afternoon about 5:30, the stevedore telephoned respondent's agents and asked where he was to get the tarpaulins. He was told the

cases did not have to be covered. The stevedore was anxious because the hour was late Saturday and he could not get tarpaulins on Sunday. The cases were loaded aboard the "Lafcomo", on the forward deck the following afternoon, Sunday, November 26th, and on the evening of that day. The "Lafcomo" finished loading about 3 A.M. November 27th. The weather was bad when she left her pier, so she was shifted to a buoy in the stream until 9 A.M. on November 29th when she sailed for New York. When the "Lafcomo" arrived here on December 16th the cases were unloaded and placed on the pier. They were very wet and appeared to have been pretty well soaked. Prospective buyers noted this and samples of the packing (spagnum moss) showed a high salt water content. Later tests clearly established that the salt water had severely damaged the lily of the valley pips which had been packed in the spagnum moss.

Libelant contends that not only did respondent breach its agreement in not covering the cases with tarpaulins but that respondent and claimant were negligent in the manner in which the cases were stowed on the forward deck, that they did not exercise reasonable and proper care. The "Lafcomo" was a Hog Island ship of the well-deck type, 419 feet long overall with a beam of 58 feet. The No. 1 and No. 2 hatches were on the forward well-deck. A solid bulwark extended along both sides of the ship. Freeing ports, mooring rings in the bulwarks and some scuppers afforded means for the ship to free herself from seas that might come aboard. Hog Island ships are known as wet ships. These cases were so stowed in the wings of the hatches that they left a space of only four inches between the outside of the stow and the bulwark, with the result that two of the four freeing ports, both of the mooring rings, and part of the scuppers in each bulwark were blocked off and obstructed. The "Lafcomo" shipped sea water on the foredeck over the bulwarks and some by the forecastle head. At intervals the foredeck would not be cleared of water from one wave before it was flooded by another wave and the lower tiers of the stow were thus submerged in sea water for considerable periods of time during the voyage.

Libelant's experts have testified and demonstrated through a model that the cases could have been stowed on top of the No. 1 and No. 2 hatches, which were three feet above the deck plating. Libelant's expert, Captain Lynner, has testified how, if this had been done, the lower tier of the stow would have been well above most of the seas that came aboard and all the ships freeing ports, mooring rings and scuppers would have been unobstructed and would have greatly aided the ship in quickly freeing herself from the sea water. By stowing the cases on the hatches instead of along the bulwarks in the wings of the hatches, the cases would have been about fifteen feet from either side of the ship— well removed from most of the seas that came aboard. Half the stow on the hatches would have been at least three feet higher from the deck, than the top of the stow as made along the bulwark, where the cases were tiered from some plank dunnage to a height of six feet and six inches. There would have been that additional protection even if no tarpaulin had been used. I believe that in stowing these cases (containing lily of the valley pips—plant life), where they were certain to be soaked with salt water, the respondent and claimant evidenced a disregard for the requirements of this particular deck cargo. They knew the libelant wanted to protect the cargo from the salt water and yet to have it stowed on deck where it would be cool. They knew that it should have had the same protection as flower bulbs, and the shipper on paying the freight in advance in New York to respondent's agents, made that request. That part of the foredeck on which the cases were stowed was the part most exposed to the waves. Not even ordinary care was used. It might have been a more laborious and difficult task to make the stow on the top of the hatches, but it could have been done, and the inherent nature of the shipment required that it should have been done.

Indeed, by stowing this cargo so that it blocked off part of the freeing ports, mooring rings and scuppers, the "Lafcomo" was rendered unseaworthy in respect to its carriage. The J. L. Luckenbach, 2 Cir., 65 F.2d 570, 572. The ship was not seaworthy "quoad that cargo" as stowed. The Thomas P. Beal, 3 Cir., 11 F.2d 49, 51. The ship itself is responsible in a suit in rem for damage to the cargo, whether the basis for the damage claim is unseaworthiness of the ship or improper stowage of the cargo. The Sundial, 2 Cir., 43 F.2d 700. A lien arises against the ship for damage to cargo caused by improper stowage. The Esrom, 2 Cir., 272 F. 266; The Star of Hope, 17 Wall. 651, 84 U.S. 651, 21 L.Ed.

719. The fact that the ship was operated by respondent under a charter from claimant does not affect the liability of the ship. The Seaboard, D.C., 119 F. 375. The cargo owner's right to the lien is based upon an implied hypothecation of the ship to secure the performance of the contract of affreightment, once the cargo is aboard. Krauss Bros. Lumber Co. v. Dimon S. S. Corp., 290 U.S. 117, 121, 54 S.Ct. 105, 78 L.Ed. 216.

The legal effect of the stamped notation on a Bill of Lading that the cargo is "Shipped on deck at shipper's risk" has been discussed in numerous decisions. Colton v. New York & Cuba Mail, S. S. Co., 2 Cir., 27 F.2d 671; The Carriso, 9 Cir., 30 F.2d 279. In The Idefjord, D.C., 31 F. Supp. 667, reversed on another point in 2 Cir., 114 F.2d 262, the trial court absolved the claimant-respondent from liability for damage to a deck cargo of wool carried in the Mediterranean and held that the deck cargo had not been negligently stowed, it having been shown that the wool as stowed was raised at least three feet above the deck and was completely covered with good tarpaulins. The wool was damaged by rain and sea water which seeped through the covering to come in contact with the wool. The vessel encountered severe tempests and seas.

■ Even though a shipper of a deck cargo assumes the risk of cargo damage by the elements, that would not relieve the carrier from the obligation to use reasonable care in reducing that risk to a minimum. He cannot consider his own convenience and select a place for on-deck stowage that would obviously unduly expose the cargo to damage by sea water. The stowage of this cargo was in the most exposed place. If the cargo had been stowed on the hatches and properly covered by tarpaulins, I believe that the sea water would not have been able to permeate the solid wooden cases and the spagnum moss packing to get at the lily of the valley pips.

Even if nothing had been said about tarpaulins it would have been the duty of the respondent and claimant not only to stow this deck cargo well away from the bulwarks, but to cover it with tarpaulins as well. But in this case we have the important additional fact, that the carrier was informed of the shipper's requirement that the cases be covered with tarpaulins. True the respondent's witnesses in their depositions claim that the shipper's agent later waived this requirement in order to have proper ventilation for this cargo. Libelant's witnesses deny any such waiver and the loading permit or shipping order contained a direction (underlined) that this deck cargo was to be covered. Respondent's port captain knew that. So did respondent's stevedores. I believe that Mr. Kruyne also knew it. Evidently the ship's Master and Chief Officer were asked about tarpaulins. The ship had only three spare tarpaulins aboard. The Master and Chief Officer of the ship told respondent's port captain "that they would not have sufficient spare tarpaulins to cover the shipment with". The stevedore's representative was concerned about the fact that he could not get extra tarpaulins on Sunday. These inquiries as to available tarpaulins must have been inspired by the specific provisions of the loading permit and by the inherent nature of the cargo, which was such as to require protection from sea water.

Respondent's principal witness, Kruyne, testified that when he told the shipper's agent that use of the tarpaulins would deprive this cargo of ventilation, the agent chose to assume the risk of damage by sea water rather than damage from lack of ventilation. Clearly ventilation for this cargo was not nearly as important as protection from the salt water and there would have been sufficient ventilation through the tarpaulins. The shipper wanted the cases stowed in a cool place; he also wanted them covered. The "Lafcomo" had no refrigeration system, so the shipper ordered on deck stowage—in fact stowage on the foredeck where on a westerly voyage across the Atlantic in early December the cargo would get the cold westerly winds which prevail at that season of the year. But he directed both orally and in writing that the cases be covered. The shipper was acting for those who grew the pips, knew their condition and what they required. The shipper's agent would not be likely to depart so readily from the wishes of his clients in an important particular.

The argument of defense that the loading permit was prepared in between two conversations had by Kruyne and Van Noort and that the arrangement as to covering with tarpaulins was changed by the second conversation, does not stand the test. The loading permit would hardly be prepared until space was arranged for. Instructions to prepare it would not have been given by Van Noort if the arrangements were

not final. Assuming that they were thereafter changed by Kruyne and Van Noort, because Kruyne convinced Van Noort that the tarpaulins would prevent the pips from getting proper ventilation, surely Van Noort would have seen to it that the loading permit was changed. But the loading permit was not changed by any one, as to place of stowage or the covering required. The original and the only copy of the loading permit were in the respondent's possession at all times from time of delivery of cargo alongside the "Lafcomo" until two months thereafter. The only notation made thereon by the stevedore's assistant shed master, was at the "Lafcomo's" dock at Rotterdam, and noted that all cases were wet when delivered.

Respondent and claimant argue that if the cases had been covered with tarpaulins they would have sprouted, that the air around them would have been dead—heated by sun on tarpaulins—with no way to circulate. I believe the testimony of Dr. Zimmerman, libelant's expert, that no such thing would have happened. Further, Dr. Zimmerman testified that circulation of air is not required to keep pips from sprouting in November or December, unless they have been refrigerated for at least two or three months, that spagnum moss is an inert substance which does not heat spontaneously. The contents of these cases were in good condition when they were received on board. They turned out all right on arrival, except for the damage by salt water. There were no signs of sprouting in the pips that were examined.

 Respondent's agents, through their port captain at Rotterdam and through their stevedore, loaded this deck cargo and stowed it under the joint supervision of the ship's master and chief officer. The respondent and claimant with knowledge of the nature of the cargo and of the damaging effect of salt water on plants or bulbs, failed to exercise due care in stowing this cargo. It was stowed where it would be most exposed to sea water from over the bulwarks, and so close to the bulwarks as to block some of the freeing ports, mooring rings and scuppers. As a result the lower tiers of cases were frequently standing in the sea water. Under the circumstances it is reasonable to conclude that the damage would not have occurred but for their joint negligence. The Nichiyo Maru, 4 Cir., 89 F.2d 539, 543; The Southwark, 191 U.S. 1, 11, 24 S.Ct. 1, 48 L.Ed. 65; The Thames, 4 Cir., 61 F. 1014. The fact that the inherent character of this deck cargo of lily of the valley pips was such that it was susceptible to damage from sea water, does not relieve the carrier where his negligence unnecessarily exposed the cargo to that damage. The ship is bound in rem, and the operator in personam, for right delivery of the cargo. The Idefjord, 2 Cir., 114 F.2d 262, 267. The respondent and claimant are jointly and severally liable to libelant for the full amount of the damage sustained by this cargo.

 As between themselves, claimant argues that the respondent should bear the entire loss. The charter party provided: "8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

Respondent's witnesses stated that the ship's chief officers and the stevedores were told by respondent's port captain that the shipper's representative had revoked his demand that the cases be covered with tarpaulins. As hereinabove stated, I have concluded that the shipper's representative did not revoke the demand that the shipment be covered. In view of this unfounded representation by respondent's agents to the ship's officers as to the alleged withdrawal of the shipper's demand, I am of the opinion that as between the respondent and the claimant, the respondent should bear the entire loss and that the respondent should be required to reimburse the claimant for any sum which the claimant may be required to pay in satisfaction of libelant's claim for damages.

Unless the parties can agree upon the amount of libelant's damage, the decree to be submitted should contain a provision for a reference of that issue to a commissioner to hear and report. Admiralty Rule 43, 28 U.S.C.A. following section 723.

I am filing herewith my Findings of Fact and Conclusions of Law, pursuant to Admiralty Rule 46½.

Submit proposed decree on two days' notice.