**DEMSEY & ASSOCIATES, INC. and Interstate Steel Company, Plaintiffs,**

v.

**S.S. SEA STAR, her engines, boilers, etc., World Bulk Shipping Ltd., Atlantic Marine Enterprises, Inc. and Pittston Stevedoring Corp., Defendants.**

v.

**The JORDAN INTERNATIONAL CO., Defendant-Impleaded.**

**No. 64 AD 82.**

United States District Court, S. D. New York.

June 3, 1970.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiffs; Alan S. Locesberg, Joseph T. McGowan, New York City, of counsel.

Zock, Petrie, Sheneman & Reid, New York City, for Atlantic Marine Enterprises, Inc. and S. S. Sea Star; Edwin K. Reid, Howard M. McCormack, New York City, of counsel.

Renato C. Giallorenzi, New York City, for World Bulk Shipping, Ltd., Celestino Tesoriero, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for Pittston Stevedoring Corp., John L. Quinlan, William P. Kardaras, New York City, of counsel.

Rosoff & Rosoff, New York City, for The Jordan International Co., Morris Rosoff, Paul S. Aufrichtig, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiffs Demsey & Associates, Inc. (Demsey), of Cleveland, Ohio, and Interstate Steel Company (Interstate), of Chicago, Illinois, instituted this action for cargo damage against the S.S. SEA STAR, her owner Atlantic Marine Enterprises, Inc. (Atlantic), the time charterer World Bulk Shipping, Ltd. (World Bulk), and the stevedore Pittston Stevedoring Corp. (Pittston) which discharged Interstate's cargo at Chicago. Jordan International Co. (Jordan), the voyage charterer, was impleaded as a defendant. The issue of liability was tried before the court without a jury, the issue of damages being reserved for later proceedings.

Plaintiff Demsey ordered 463 secondary hot rolled steel coils from The Eastern Steel & Metal Co. by purchase order dated July 3, 1963 and invoice dated August 15, 1963. Plaintiff Interstate ordered 691 prime hot rolled steel coils from The Eastern Steel & Metal Co. by purchase order dated May 2, 1963 and invoice dated August 15, 1963. (Eastern filled the order with 691 *secondary* steel coils, but this issue is not here involved.) The plaintiffs opened irrevocable letters of credit payable on presentation of clean-on-board bills of lading, and the coils were obtained by Eastern from Altos Hornos de Mexico, S. A., of Monclova, Mexico.

The coils consigned to plaintiffs were loaded aboard the SEA STAR at Tampico, Mexico, each coil made of secondary steel, weighing approximately 4 to 5 tons. The coils were in a rusted condition at the time of loading. The coils were properly and adequately strapped for the ocean voyage from Tampico to Great Lakes ports, each coil being strapped by two 2-inch bands around the circumference and four passing through the eye at quarter points in the circumference. The outer laps of each coil were tack-welded to the next inside lap.

The time charter of the SEA STAR between Atlantic as owner and World Bulk as charterer provided that upon the vessel's delivery at Tampico she was to be "tight, staunch, strong and in every way fitted for the service * * *", and Clause 8 provided:

"The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the

supervision of the Captain who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts."

World Bulk was to provide the necessary dunnage and shifting boards, and the time charter was subject to the "U.S. A. Clause Paramount." The voyage charter between World Bulk and Jordan provided that the cargo was "to be loaded, stowed and discharged free of risk and expense to the vessel," and that the "U.S. Clause Paramount" and New York Produce Exchange Arbitration Clause" were to incorporated therein.

On August 16, 1963, prior to the completion of the loading of the coils, three bills of lading were issued in Tampico by Representaciones Maritimas, S. A. (Representaciones), World Bulk's agents—two with respect to the steel coils being shipped to Interstate, Chicago, and one with respect to the coils being shipped to Demsey, Cleveland. Each bill of lading was signed by Representaciones "for the master," and stated that the coils were shipped at Tampico "in apparent good order and condition" and were "received on board—clean on board." Representaciones issued the three bills of lading at the request of Jordan which had been advised that the loading had not been completed and which knew that the coils were in a rusted condition. Neither World Bulk nor its agents, Representaciones, was authorized to sign the bills of lading for or on the master's behalf.

On August 19, 1963, Jordan, with the knowledge of Atlantic, issued a letter of indemnity to World Bulk agreeing to indemnify World Bulk for any loss it might suffer by reason of the fact that the coils were rusted.

The loading was done by the ship's gear, and prior to departure, the master signed a clean mate's receipt covering the coils.

The stowage plan prepared by Representaciones shows that the coils consigned to Interstate (Chicago) were stowed in Nos. 1–5 lower holds, and the coils consigned to Demsey (Cleveland) were stowed in Nos. 1–5 lower holds, above the Interstate coils, and in Nos. 1, 2, 4, 5 'tween deck. The 'tween deck hatch boards were old and dry and the chief officer instructed the stevedores not to stow any coils over the hatch boards.

The SEA STAR sailed from Tampico on August 21, 1963 and arrived in Cleveland, Ohio, on September 27, 1963 after having called at Charleston, South Carolina for approximately four days to take on fuel, and at Montreal for approximately ten days to be equipped with certain fittings. (These calls did not constitute unreasonable deviations, *see* Morrison & Stumberg, Cases and Materials on Admiralty, 367 (1954); Gilmore & Black, The Law of Admiralty, § 3–41 (1957); Poor, Charter Parties and Ocean Bills of Lading, § 69 (1968).)

The plaintiffs did not inspect the steel coils prior to their arrival in Cleveland and were not aware of the rusted condition of the coils at the time of loading in Tampico.

When the hatches were opened on the arrival of the vessel in Cleveland, many of the coils were found to be damaged. Prior to discharge, Ralph R. Peachman, a marine surveyor, inspected the Demsey coils at the request of the Cleveland Stevedoring Co. which had been engaged by World Bulk to discharge the Demsey coils. Peachman confirmed that the hatch boards in the 'tween decks were in poor condition. His inspection revealed that there was inadequate chocking throughout the stow, with the result that coils had shifted out of their original stow, breaking or splintering a total of 30 hatch boards, and a number of coils had lodged between the beams in the square of the hatch and one had broken through the hatch boards, dropping into the lower hold. In Nos. 1, 2 and 5 lower holds, Peachman found that Demsey coils had been overstowed and interstowed with the Chicago coils, requiring that the Chicago coils be moved in order to discharge the Demsey coils. In Nos. 4 and 5 lower holds, Peachman found that the coils had been dumped in with-

out regard for uniformity. By reason of the poor condition of the 'tween deck hatch boards and the improper stowage, Peachman found substantial damage to the Demsey coils such as crimping, bending, telescoping, and the breaking or loosening of the bands in both the 'tween deck and the lower hold.

The Peachman survey found that all of the Demsey coils were rusted, for which no claim is made by Demsey. However, Peachman also found serrations or sling marks in the eyes of some of the coils and was of the opinion that these were caused by handling during the loading of the vessel or prior thereto.

Following Peachman's inspection, the Demsey coils were discharged by the stevedore and loaded on trucks for delivery to a storage warehouse. At the warehouse, the coils were jointly surveyed by William G. Davies, Jr., a marine surveyor representing the cargo underwriters, and Paul J. Ranshan, a marine surveyor representing the SEA STAR's interests.

Following the completion of the discharge, the SEA STAR proceeded to Chicago, arriving on October 1, 1963. On arrival, and prior to the discharge, surveyor Davies, and George E. Fanning, a marine surveyor representing the SEA STAR, inspected the Interstate coils. Their inspection revealed that several coils in No. 1 lower hold had shifted due to inadequate shoring and chocking, causing damage such as edge crimping and telescoping to the coils. In the other lower holds, Nos. 2–5, there was no evidence of shifting, but the coils were cutting into each other due to a lack of chocking or dunnage separating the coils.

The surveyors found crimped edges in the eyes of the coils and telescoping and broken bands on some of the coils, which they attributed to handling either during loading in Tampico or prior thereto,[1] and the presence of atmospheric rust on all the coils, and excessive rust and pitting on some.[2] Subsequent chemical analysis established that the excessive rusting and pitting were not due to salt water.

The Interstate coils were discharged by defendant Pittston, the stevedore employed by Midland Overseas Shipping Corp., agents for World Bulk. The discharge was commenced on October 1, 1963 and completed the following day. Pittston prepared a "cargo exception report" dated October 2, 1963, which was signed by the SEA STAR's master and which stated:

"All coils rusty. 50% of all coils have broken bands. All coils wrinkled. Edges crimped on all bundles."

The discharge by Pittston was observed, at least in part, by surveyors Davies and Fanning, and photographs were taken which established improper discharge. Pittston used bare wire slings without spreader bars or other protective devices, and included as many as three coils in one lift, causing the edges of the coils to cut into each other. Some of the coils were landed on the top of others and some were dropped on the cement dock. Surveyor Fanning and a representative of Interstate complained to Pittston concerning the manner of discharge, but no corrective action was taken by Pittston.

The court finds on all of the evidence that Pittston failed to discharge the coils in a proper manner, causing substantial additional damage to the coils, such as edge crimping, broken bands and telescoping.[3]

Following discharge, the Interstate coils were trucked to a warehouse where they were surveyed by Davies, Fanning,

1. Some of this damage may have been due to movement of the coils in Cleveland to permit the unloading of the Demsey coils because of the conditions existing in holds Nos. 1, 2 and 5.

2. A later survey revealed that sixty-four coils were excessively rusted and pitted.

3. There is evidence that a number of coils had broken straps or had telescoped prior to their arrival in Chicago. Because of the damaged condition of these coils before discharge, additional damage during discharge would have been unavoidable.

and W. J. Coakley, a marine surveyor representing Interstate.

The court has subject matter jurisdiction and jurisdiction over the parties.

 Upon the issuance of the bills of lading at Tampico, the loading, stowage, transport, and discharge of the coils became subject to the Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. § 1300 et seq. COGSA, § 1305; *see* generally, Gilmore & Black, The Law of Admiralty, *supra*, § 4–17.

 Under COGSA, plaintiff established a *prima facie* case by proving receipt of the coils by the carrier in good order, and delivery in damaged condition at destination. Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669 (9th Cir. 1962); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir. 1966), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70; Interstate Steel Corp. v. S.S. "Crystal Gem", 317 F.Supp. 112 (S.D.N.Y., filed February 25, 1970). Proof of good order at the time of shipment, sufficient for plaintiffs' *prima facie* case, was evidence by the clean-on-board bills of lading. COGSA, § 1303 (4); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 452 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Interstate Steel Corp. v. S.S. "Crystal Gem", *supra*.

 Under COGSA, World Bulk[4] and the SEA STAR[5] were bound, before and at the beginning of the voyage, to exercise due diligence to make the ship seaworthy and to make all parts of the ship in which the coils were to be carried, fit and safe for their reception, carriage and preservation, and to properly and carefully load, handle, stow, and discharge the coils. § 1303(1) and (2). Once plaintiffs had established their *prima facie* case, World Bulk and the SEA STAR, through her owner Atlantic, had the burden of proving that the damage to the coils was not due to their negligence or that it was occasioned by one of the "excepted causes" in § 1304 (2). Daido Line v. Thomas P. Gonzalez Corp., *supra*; Mamiye Bros. v. Barber Steamship Lines, Inc., *supra*; American Tobacco Co. v. The Katingo Hadjipatera, *supra*; Mente & Co. v. Isthmian S.S. Co., 36 F.Supp. 278 (S.D.N.Y.1940), aff'd, 122 F.2d 266 (2d Cir. 1941); Interstate Steel Corp. v. S.S. "Crystal Gem", *supra*.

World Bulk and the SEA STAR have failed to prove that the damage to the coils was not due to their negligence, and indeed the evidence indicates the contrary. The SEA STAR's 'tween deck hatch boards were old and dry and the chief officer instructed the stevedores not to stow any coils over the hatch boards. Surveyor Davies, testifying for plaintiffs, was of the opinion that the stowage of the coils in the 'tween deck was improper in that there was insufficient shoring; the coils were not stowed wing to wing; and there was no provision across the hatch squares to prevent the coils from shifting and moving into the hatches. On the basis of the evidence, the court finds that the coils could not be stowed wing to wing across the 'tween deck hatches because of the poor

---

4. World Bulk was bound as the "carrier" of the plaintiffs' coils, since its agents, Representaciones, signed the clean-on-board bills of lading, and thereby entered into the contract of carriage with the shipper. § 1301(a).

5. The SEA STAR became liable to the plaintiffs *in rem* once the coils were aboard, Pioneer Import Corporation v. The Lafcomo, 49 F.Supp. 559 (S.D.N.Y. 1943), aff'd, 138 F.2d 907 (2d Cir. 1943), cert. denied, Black Diamond Lines, Inc. v. Pioneer Import Corp., 321 U.S. 766,

64 S.Ct. 523, 88 L.Ed. 1063 (1944), and the sailing with the coils aboard constituted a ratification of the bills of lading, The Muskegon, 10 F.2d 817 (S.D.N.Y. 1924); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D. N.Y.1966). However, since Atlantic, the SEA STAR's owner, did not authorize World Bulk or World Bulk's agents to issue the bills of lading for or on its behalf, Atlantic is not liable to the plaintiffs, *cf.* United Nations Children's Fund v. S/S Nordstern, *supra*.

condition of the hatch boards. Surveyor Davies was also of the opinion that the inability of the stevedores to stow the coils wing to wing across the hatches, and to properly shore them and tone them down due to the poor condition of the hatch boards, made the SEA STAR unseaworthy with respect to carrying coils in the 'tween deck, and the court agrees. The coils were not properly and carefully stowed as there was inadequate chocking and shoring. Moreover, Pittston's discharge of the Interstate coils in Chicago was improper.

World Bulk and the SEA STAR have failed to prove that the damage to the coils, with the exception of rust, was occasioned by one of the "excepted causes" in § 1304(2). The evidence shows that the coils were properly and adequately strapped for the voyage, and that there was no inherent vice in the coils which led to any damage other than rust.

World Bulk and the SEA STAR have not rebutted plaintiffs' *prima facie* case that, with the exception of rust, the coils were in good order and condition at the time of loading. Kupfermann v. United States, 227 F.2d 348, 349–350 (2d Cir. 1955).

■ Therefore, plaintiffs Demsey and Interstate are entitled to recover *from World Bulk and the SEA STAR for* the damage, with the exception of rust, to their coils.

■ With respect to Interstate's claim for rust damage, the evidence shows that all the Interstate coils had normal atmospheric rust which was due to inherent vice, and Interstate is not entitled to recover for this damage. Pan American Trade Development Corp. v. M/V Helga Howaldt, 257 F.Supp. 721 (S.D.Fla.1966). Sixty-four of the Interstate coils were found to have excessive rust and pitting. This excessive rust and pitting was not due to inherent vice. Copco Steel & Engineering Co. v. The Prins Willem Van Oranje, 159 F.Supp. 79 (E.D.Mich.1957); Copco Steel & Engineering Co. v. S/S Alwaki, 131 F. Supp. 332 (S.D.N.Y.1955); Copco Steel

& Engineering Co. v. The Prins Frederik Hendrik, 129 F.Supp. 469 (E.D.Mich. 1955). While the 64 coils may have had excessive rust and pitting at the time they were loaded, Interstate had no knowledge of this condition. In view of the issuance of the clean-on-board bills of lading with knowledge of Jordan's letter of indemnity, World Bulk and the SEA STAR are estopped from asserting that the 64 coils were excessively rusted and pitted at the time of loading. The Carso, 43 F.2d 736, 744 (S.D.N.Y.1930), aff'd in part and rev'd in part, 53 F.2d 374 (2d Cir. 1931); Levatino Company v. S.S. Norefjell, 231 F.Supp. 307, 318 (S.D.N.Y.1964); Copco Steel & Engineering Co. v. S/S Alwaki, *supra*, 131 F.Supp. at 334; Standard Brands, Inc. v. The Radja, 114 F.Supp. 456, 458 (N. D.Cal.1953). Therefore, plaintiff Interstate is entitled to recover for the excessive rust damage to the 64 coils from World Bulk and SEA STAR.

■ Plaintiffs were not bound or affected by the provisions of either the time charter or the voyage charter as their terms were not incorporated in the bills of lading. While each bill of lading was subtitled, "To be used with Charter-Parties," and contained the following additional language with regard to charter parties,

"* * * freight at the rate of (say per ) as per Charter-Party, dated

"All the terms, conditions, liberties, and exceptions of the Charter-Party are herewith incorporated,"

this does not show what, if any, charter party was intended to be incorporated. Southwestern Sugar & Molasses Co. v. The Eliza Jane Nicholson, 126 F.Supp. 666, 668 (S.D.N.Y.1954); *accord*, United States v. Cia. Naviera Continental, S. A., 202 F.Supp. 698 (S.D.N.Y.1962).

■ The coils consigned to Interstate were discharged by Pittston in a negligent manner, and Pittston is liable to Interstate for the damage suffered by the coils during discharge at Chicago, Robert C. Herd & Co. v. Krawill Machin-

ery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959) ; Luigi Serra, Inc. v. S.S. Francesco C., 1965 A.M.C. 2029 (S. D.N.Y.1965), not officially reported, aff'd, 379 F.2d 540 (2d Cir. 1967).

While Pittston contends that damage during discharge was unavoidable due to the damaged condition of many of the coils prior to discharge, the evidence establishes that substantial additional damage was due to Pittston's improper discharge. While the unloading of the coils called for a high degree of professional skill, Pittston held itself out as possessing this professional skill. Had Pittston felt that the condition of the coils would risk substantial additional damage in unloading, it should have so notified Interstate prior to discharge. United States v. The Bull Steamship Line, 274 F.2d 877 (2d Cir. 1960) ; O'Brien Bros. v. United States, 171 F.2d 566 (2d Cir. 1948) ; The Robert R., 255 F. 37 (2d Cir. 1918).

Therefore, plaintiff Interstate is entitled to an interlocutory judgment holding World Bulk and the SEA STAR liable for the damage to its coils (exclusive of normal atmospheric rust), and holding Pittston liable for the damage which occurred during discharge. Plaintiff Demsey is entitled to an interlocutory judgment holding World Bulk and the SEA STAR liable for the damage to its coils (exclusive of rust, for which it makes no claim).

Having determined that World Bulk and the SEA STAR are liable to plaintiff Demsey, and that World Bulk, the SEA STAR and Pittston are liable to plaintiff Interstate, it becomes necessary to determine to what extent they are entitled to indemnity from the other defendants.

### Atlantic

 Atlantic, as owner of the SEA STAR, agreed in the time charter to provide a vessel which was "tight, staunch, strong, and in every way fitted for the service." Thereby, Atlantic impliedly warranted to World Bulk that the SEA STAR was seaworthy for the transporta-tion of the coils. Luckenbach v. W. J. McCahan Sugar Refining Co., 245 U.S. 139, 150, 39 S.Ct. 53, 63 L.Ed. 170 (1918). Since the court has found that the 'tween deck area of the SEA STAR was unseaworthy by reason of the poor condition of the hatch boards, Atlantic breached its implied warranty. Accordingly, World Bulk is entitled to indemnity from Atlantic to the extent of the damages it is required to pay Demsey by reason of the damage in transit to the coils which were stowed in the 'tween deck. Petition of Reliance Marine Transp. & Constr. Corp., 206 F.2d 240, 243 (2d Cir. 1953) ; Connecticut Adamant Plaster Co. v. James McWilliams Blue Line, Inc., 149 F.Supp. 122, 126 (S.D.N.Y.1957), aff'd, 253 F.2d 785 (2d Cir. 1958).

### World Bulk

 With respect to the damage to the coils which were stowed in the lower holds, Atlantic is entitled to indemnity from World Bulk. The clean-on-board bills of lading were issued by World Bulk's agents, without authority from Atlantic, and in consideration of Jordan's letter of indemnity to World Bulk. World Bulk had the duty to load and stow the coils under the time charter, and World Bulk engaged Pittston to discharge the Interstate coils in Chicago. The Falkefjell v. Arnold Bernstein Shipping Co., 223 F.2d 820 (2d Cir. 1955) ; Pioneer Import Corp. v. The Lafcomo, 49 F.Supp. 559 (S.D.N.Y.1943), aff'd, 138 F.2d 907 (2d Cir. 1943), cert. denied, Black Diamond Lines, Inc. v. Pioneer Import Corp., 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944) ; United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1966) ; Luigi Serra, Inc. v. S.S. Francesco C., *supra.*

### Pittston

 Pittston's warranty of workmanlike service ran in favor of World Bulk, its employer, and for the benefit of the SEA STAR, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413

(1959), and Pittston breached its warranty in discharging the coils in a negligent manner. Massa v. C. A. Venezuelan Navigacion, 332 F.2d 779 (2d Cir. 1964); cert. denied, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186. Therefore, to the extent that Interstate recovers *in rem* from the SEA STAR by reason of the damage to the coils during discharge in Chicago, Atlantic is entitled to indemnity from Pittston. Luigi Serra, Inc. v. S.S. Francesco C., *supra*. World Bulk is also entitled to indemnity from Pittston with respect to all damages it is required to pay Interstate by reason of the negligent discharge of the Interstate coils in Chicago. Luigi Serra, Inc. v. S.S. Francesco C., *supra*; Interstate Steel Corp. v. S.S. "Crystal Gem", *supra*.

### Jordan

World Bulk and Atlantic claim that they are entitled to indemnity from impleaded defendant Jordan, since under the voyage charter between World Bulk and Jordan, Jordan was responsible for the loading, stowage, and discharge of the coils, and for the further reason that Jordan gave a letter of indemnity to World Bulk *in consideration of the issuance of clean-on-board bills of lading prior to the completion of the loading at Tampico. Jordan denies the claims of World Bulk and Atlantic, and asserts that since they arise under the voyage charter, they must be arbitrated pursuant to the arbitration clause contained therein.

 It appears from the evidence that Jordan had the obligation to load, stow, and discharge the coils free of risk and expense to the vessel, and in fact paid all the charges in connection therewith. However, World Bulk's agents, Representaciones, "coordinated" the loading and stowage operations in Tampico, and World Bulk employed Pittston to discharge the Interstate coils in Chicago. Accordingly, World Bulk has no claim against Jordan by reason of the damage to the coils from improper loading and stowing in Tampico or improper discharge in Chicago. On the other hand, Jordan's letter of indemnity covered rust damage, so that World Bulk is entitled to indemnity from Jordan for any damages World Bulk is required to pay Interstate by reason of the 64 coils which were excessively rusted and pitted. Having actively participated in this litigation, Jordan waived its right to have its liability determined under the arbitration clause in the voyage charter. Cornell & Company v. Barber & Ross Company, 123 U.S.App.D.C. 378, 360 F.2d 512 (1966).

 Atlantic is entitled to indemnity from Jordan, to the extent that Interstate recovers *in rem* from the SEA STAR by reason of the excessive rust damage, in view of Jordan's letter of indemnity to World Bulk. Atlantic is not entitled to indemnity from Jordan for failure to properly load, stow, and discharge the coils, since Representaciones, the agents of World Bulk, "coordinated" the loading and stowing operations in Tampico and World Bulk employed Pittston to discharge the coils in Chicago. (However, Atlantic is entitled to indemnity from World Bulk, the carrier, for the damage to the coils stowed in the lower holds as hereinbefore stated.)

### DAMAGES

The computation of damages was reserved for later proceedings. It is apparent that the allocation of the damage to a particular coil as between the defendants, including the right of indemnity, will be a very complicated task. For example, an Interstate coil which had excessive rust so as to make World Bulk liable with right of indemnity against Jordan, may have suffered damage in transit, for which World Bulk is liable, and additional damage in the course of discharge, for which World Bulk and Pittston are liable, with World Bulk having a claim for indemnity against Pittston. The surveyors' reports indicate that plaintiff Interstate's claim for excessive rust will not exceed $4480., and plaintiffs' total claims for damage to the coils do not exceed $80,000. Rather than incurring the expense of having a Com-

missioner attempt an allocation, it is suggested that the defendants agree as to the amount of the total damages due to each plaintiff, and arbitrarily allocate these amounts between the different types of damage. The court will be glad to be of assistance in such an endeavor.

The foregoing constitutes the court's findings of fact and conclusions of law on the issue of liability. Rule 52(a), F. R.Civ.P.

Settle interlocutory judgment in accordance with the foregoing.