**LEVATINO COMPANY, Inc., Libellant,**

v.

**S.S. NOREFJELL, her engines, etc., and A/S Falkefjell OG A/S Dovrefjell, Claimant-Respondent,**

and against

**Sud America Terrestre Y Maritima Compania De Seguros Generales, Respondent,**

and against

**Maher Stevedoring Co., Respondent-Impleaded.**

United States District Court
S. D. New York.
April 28, 1964.
As Amended May 19, 1964.

Bigham, Englar, Jones & Houston, New York City, for libellant, F. Herbert Prem, New York City, of counsel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for respondent S. S. "Norefjell", her engines, etc., and A/S Falkefjell Og A/S Dovrefjell, James E. Freehill and Donald B. Allen, New York City, of counsel.

Thomas J. Blake, New York City, for respondent Sud America Terrestre Y Maritima Compania De Seguros Generales.

Mendes & Mount, New York City, for respondent-impleaded Maher Stevedoring Co., Alfred A. Lohne, New York City, and Brendan J. Connolly, New York City, of counsel.

HERLANDS, District Judge:

The libellant, Levatino Company, Inc., a New York City firm of fruit and vegetable importers, has brought this cargo damage action in admiralty against the ocean carrier whose vessel transported the cargo, A/S Falkefjell Og A/S Dovrefjell, a Norwegian corporation (hereinafter "the carrier"), and against the libellant's cargo underwriter,[1] Sud Amer-

---

1. The libel is captioned as A/S Falkefjell Og A/S Dovrefjell, as the owner and/or operator and/or controller of the vessel

S.S. "NOREFJELL" (Libel, par. "Second") and as against "The S.S. 'NOREF-JELL', her engines, etc., in a cause of

ica Terrestre y Maritima Compania de Seguros Generales (hereinafter "the underwriter").

The carrier[2] impleaded Maher Stevedoring Company, Inc., (hereinafter "the stevedore") which discharged the cargo at the Harborside Terminal pier in Jersey City.

The transactions and events giving rise to this litigation occurred in 1959.

The carrier, through its agent in Buenos Aires, had issued eight clean bills of lading covering the cargo and its transportation to the port of New York.

The libellant seeks to recover $185,983.70 from the underwriter, said to be based upon the formula of calculation of a loss under a marine insurance policy, and the sum of $200,869.33 from the carrier, said to be based upon the common law measure of recovery under the provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(5), viz., the amount of damage actually sustained. It is claimed that libellant suffered damages as a result of the carrier's breach of the bills of lading contract of carriage with respect to the portage of 43,169 containers (boxes and cartons) of apples from the port of Buenos Aires, Argentina, to the port of New York.[3]

Libellant claimed that, on out-turn, the apples were "crushed, bruised, cut, gouged and otherwise deteriorated"[4] and

contract and cargo damage, civil and maritime".

The respondent-underwriter issued a marine insurance policy (Policy #421695) to libellant covering a cargo of 43,169 cases of apples in the sum of $237,429.50. The policy (Exhibit 5, p. 1) insured against the following risks, inter alia: " * * * loss or damage occasioned by breakdown or latent defect of refrigerating machinery or negligence, default, error in judgment of the pilot, master, officers, engineers, mariners, refrigerating engineers or other servants of the ship or other persons who may be responsible therefor or by negligence in stowage * * *."

A separate action filed against the respondent-underwriter (Ad. 199–342) was consolidated with the action against S.S. "NOREFJELL" and A/S Falkefjell Og A/S Dovrefjell (Ad. 199–338). In the libellant's separate action against the underwriter, the latter impleaded the carrier.

2. The impleading petition of the respondent-carrier was filed March 14, 1960, in the original action (Ad. 199–338). The impleading petition in the consolidated cause (Ad. 199–338–342) was filed June 9, 1960. The stevedore's answers to the libel and to the impleading petition were filed October 14, 1960.

3. The libel (filed against the carrier on November 12, 1959) alleged that the libellant's shipper (Francisco Bendiner) delivered to the carrier, at the port of Buenos Aires on April 28, 29 and 30, 1959 "various consignments of fresh apples, in good order and condition"; that the carrier agreed to carry the cargo of 43,169 containers to the port of New York "there to be delivered, in like good order and condition as when shipped," in accordance with eight bills of lading signed and delivered by the carrier's agent (par. "Sixth"). The libel (par. "Seventh") further alleged that the carrier loaded the said shipments "in the same good order and condition as when delivered to respondent [the carrier]"; and that, when the vessel arrived on or about May 23, 1959 at the port of New York and "discharged certain portions of said shipments * * * and on delivery to libellant, certain portions of the shipments were not in like good order and condition as when delivered to respondent and to the said vessel but, on the contrary, a large number of the wooden cases were split, splintered, and cracked, with slats broken; the contents thereof being crushed, bruised, cut, gouged and otherwise deteriorated. The missing portions of said shipments have not been delivered at the port of destination nor at any other port."

The libel (par. "Tenth") demanded $201,000 as sustained damage, together with interest thereon, costs and disbursements.

In the amended libel filed against the underwriter (par. "Fourth"), the libellant likewise alleged that the 43,169 containers of apples were "shipped in good order and condition, from a warehouse in Buenos Aires and delivered to the S.S. 'Norefjell' for carriage * * *." The amended libel against the underwriter (pars. "Fifth" and "Seventh") alleges that the damages suffered by the libellant amounted to $185,983.70.

4. Libellant claims that two distinct types of damage were sustained by the apples:

that such condition, on out-turn, was caused by the carrier's negligent stowage and refrigeration system and by the stevedore's culpable misconduct in walking on the containers of apples in the course of the cargo discharging operations.

The libel alleged that the cargo was delivered to the carrier and loaded by the carrier "in good order and condition." [5]

Issue was joined; [6] and a trial was thereupon held. [7]

On the next to last day of trial, libellant injected a new theory of estoppel as an alternative basis for recovery.

The libellant's post-trial briefs present the estoppel theory as an alternative to

(1) bruising, and (2) imparted overripening and mealiness.

As to bruising, libellant contends that a large number of apples were out-turned bruised. According to the testimony of the United States Government fruit and vegetable inspectors, "An apple is damaged by bruising when it is a bruise more than three-quarters of an inch in diameter or more than a quarter of an inch in depth or soft; or an aggregate of small bruises of one inch in diameter in medium sized apples" (T.R. p. 1220). [References to the official reporters' minutes of the trial proceedings (trial record) are designated "T.R. p."] Libellant claims that the bruising was the result of both the carrier's negligent method of stowage and the stevedore's negligent unloading procedures.

As to imparted overripening and mealiness, libellant contends that a large number of apples were out-turned in an overripe and mealy condition. "Overripe" and "mealy" apples have been generally described as being soft and containing very little juice (T.R. p. 1234). This alleged condition of overripeness and mealiness was attributed by libellant to the ship's inadequate refrigeration system and the carrier's negligent method of stowage that prevented adequate ventilation and refrigeration of the fruit. Both factors allegedly accelerated the ripening process of the apples to the point that, on discharge, they were "overripe" and "mealy" and hence commercially unsalable or salable at extremely low prices.

The quality or condition of apples is described by terms variously used, as follows:

*ripe:*—fairly firm (Partridge, T.R. p. 1233); mealy but eatable (Barefield, T.R. p. 879); in a downward stage with less juice than firm ripe (McCabe, T.R. p. 707).

*firm ripe:*—a little firmer than ripe (Partridge, T.R. p. 1233); a degree harder and firmer than ripe (McCabe, T.R. p. 740); showing 12 to 15 pounds pressure (Exh. Y-3, p. 39 also referred to as "prime").

*overripe:*—soft, mealy with practically no juice (Partridge, T.R. 1234); excessively mealy (Barefield, T.R. p. 880); ripe and mealy (McCabe, T.R. p. 740).

*mealy:*—lost its crispness (Barefield, T.R. p. 880); lost its juice (McCabe, T.R. p. 740).

*flattened:*—indented or flattened out of the round shape (T.R. p. 860, Barefield).

*fully ripe:*—has to be eaten right away, deteriorates rapidly (Moreland, T.R. p. 574).

5. See n. 3, supra; Libel (filed November 12, 1959), pars. "Sixth" and "Seventh".

6. The carrier's answer (filed March 14, 1960) to the libel admitted only that the apples were in "*apparent* good order and condition" when delivered and loaded. (Emphasis added.)

Answer of A/S Falkefjell Og A/S Dovrefjell, par. "Sixth". The carrier also alleged that it "discharged and delivered the aforesaid shipment in the same apparent order and condition as when received, except that some of the wooden cases had cracked or broken boards." Id., par. "Seventh".

Par. "9" of the pretrial order (filed January 21, 1963 formulated the issues as to the carrier and the ship as follows:

"(a) (1) Did any of the apples sustain damage while in the custody or under the control of respondent carrier, or while stowed aboard the S.S. 'Norefjell' and, if so, (2) what type of damage was sustained, and (3) did this constitute a breach of the carrier's contractual legal duties?"

Par. "3" of the pretrial order explicitly stated:

"(b) It is the libellant's contention that: *The apples were sound and having the proper degree of maturity for export to New York when delivered to respondent and the S.S. 'Norefjell' and they became damaged subsequent to load-*

the position taken by the libellant throughout most of the trial. This estoppel theory is predicated upon the factual premise that the apples were overripe and bruised at the time of loading and that the carrier, having issued clean bills of lading, is estopped from now asserting that the cargo was other than as represented by the carrier in its bills of lading. The libellant's factual position during most of the trial was that the apples were in good order and condition at the time of loading. To cover the alternative theories, libellant has submitted alternative sets of proposed findings. Compare Libellant's Proposed Findings of Fact After Trial [September 23, 1963] Nos. 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 with Nos. 46, 47, 48, 49, 50, 51, 52.

■ This action is governed by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq. Under COGSA, the establishment of a prima facie case requires proof by the libellant, first, that its goods were loaded in good condition and, second, that its goods were out-turned in a poor or damaged condition. See M. W. Zack Metal Company v. S.S. Birmingham City, 311 F.2d 334, 337 (2d Cir. 1962) cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449, 450 (2d Cir. 1951), cert.

denied, American Tobacco Co. v. Hadjipateras, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Copco Steel & Engineering Company v. S/S Alwaki, 131 F.Supp. 332, 333 (S.D.N.Y.1955); Gilmore & Black, The Law of Admiralty, § 3–43, p. 162 (1957).

■ As part of its proof to establish the first element, libellant offered in evidence the eight bills of lading issued by the carrier, acknowledging receipt of the cargo of boxes of apples in apparent good order and condition.[8] A clean bill of lading is initial proof "of freedom from open and visible damage prior to transportation." Copco Steel & Engineering Company v. S/S Alwaki, supra; see Stirnimann v. The San Diego, 148 F.2d 141, 142 (2d Cir. 1945); The Bencleuch, 10 F.2d 49, 52 (2d Cir. 1925) cert. denied 271 U.S. 680, 46 S.Ct. 631, 70 L.Ed. 1148 (1926). As Judge Hand said in The Bencleuch, the admission represented by a recital of "apparent good order and condition" in a bill of lading goes no further than "to create prima facie proof that to the eye the boxes were secure and sufficient, and that the lemons, so far as visible, were not damaged."

While the contents of the vast majority of the containers were actually not discernible to the carrier prior to loading in the sense of the carrier's being

---

ing on said ship and prior to discharge therefrom." (Emphasis added.)

Libellant's pretrial and trial memoranda likewise took the position that the apples were in good order and condition on loading. Libellant's pretrial memorandum declared: "The testimony establishes also that the apples were sound and had the proper state of maturity for export to New York when delivered to respondent's ship." Libellant's Pretrial Memorandum, January 21, 1963, p. 3.

Libellant's trial memorandum declared: "The testimony establishes, preponderately, that the apples were sound and had the proper state of maturity for export to New York when delivered to the ship." Libellant's Trial Memorandum, p. 3.

A claim or contention predicated upon the theory of estoppel was never mentioned by libellant or any other party in the pretrial order, the pretrial memoranda or the trial memoranda.

7. On its direct case, libellant sought to prove that the apples were in good order and condition when loaded. See T.R. pp. 12a, 14, 16, 123, 171, 235, 236, 241, 242.

8. The eight bills of lading each acknowledged receipt at Buenos Aires "from the shipper named on the back hereof [Francisco Bendiner], [of] the packages or articles mentioned on the back hereof [boxes of apples], * * * in apparent good order and condition." Exh. 1. This recital is the only one material to the litigated issues.

Salen Shipping Companies time-chartered the ship from the owners, the respondent-carrier (T.R. pp. 1363, 1368–1369). The acts of the time-charterer in Buenos Aires, including the signing of the eight bills of lading, bound the ship and the owners of the ship (T.R. p. 1369). This was not disputed at the trial (T.R. pp. 1056–1057).

able to make a visual determination of the boxed apples,[9] the carrier did employ a fruit expert (Ollivier) who test-sampled and inspected the shipment on the Buenos Aires pier. This inspection by the carrier was conducted independently of the official inspection by the Argentine Government inspectors. T.R. pp. 167–169, 248, 250, 254, 257.

In addition, continuously throughout the loading period, the carrier's representatives (Dybeck and Nazzari) kept informed of the quality of the apples being loaded and insisted that only good apples be loaded. T.R. pp. 1924, 1926, 1930–1931, 1944, 1946–1948, 1952–1953.

As further substantiation of its original (and later, alternative) assertion that the apples were in good order and condition when delivered to the ship and loaded thereon, libellant introduced depositions of Argentine Government fruit inspectors[10] which convincingly proved (and the Court so finds) that no overripe or bruised apples were approved for export purposes[11] except for 250 boxes, which will be more particularly discussed herein.

The Court finds that, when loaded at Buenos Aires the fruit (except for 250 boxes) possessed the proper state of maturity and other qualities suitable for transportation in a reefer to the port of New York.

During the trial, libellant conceded that the ship was adequately refrigerated and that libellant does not contend that there was any unseaworthiness or negligence on the part of the carrier or the ship with regard to the ship's refrigeration system. T.R. p. 2281.

Independently of that concession, the evidence demonstrates beyond any reasonable doubt that this ship, built in 1956, was equipped with and operated modern and effective refrigeration and

9. The apples were packed in wooden boxes and fibreboard cartons; and each apple was individually wrapped in paper.

10. There were six Argentine Government fruit and vegetable inspectors. Three of them (Luque, Cavellero and Coloma) were sanitary or health inspectors and checked to see whether the apples were diseased. The other three (Del Signo, Giordano and Dieguez) were commercial-quality and condition inspectors (T.R. pp. 218–219).

11. T.R. p. 236. (Answers of Luque, Del Signo, Giordano and Dieguez). The Argentine Government inspectors also testified that they did not find "any condition of overripeness or decay in the apples. * * *" (T.R. pp. 235–236).

These conclusions were based on tests conducted during the period of April 28–30, 1959 by the Argentine Government inspectors whereby randomly selected boxes and apples (from 1 percent to 3 percent of the total shipment) were individually examined (T.R. p. 222), cut open (T.R. pp. 228–229), subjected to pressure tests (T.R. pp. 229–230), and subjected to temperature tests (T.R. pp. 233–234), to determine whether there had been compliance with the applicable regulatory provisions and whether the boxes and the apples had the necessary qualifications for export. T.R. pp. 217–220, 225, 235–236, 241, 275. Apples showing any lesion would be rejected. T.R. p. 275.

The Argentine law requires that all fruit intended for export must be inspected and approved by Government fruit inspectors and an export certificate issued by the chief of their department. T.R. p. 104. Export quality certificates, as well as sanitary certificates, required by the law of Argentina certifying to the sound condition of libellant's apples were issued by the chief inspector. T.R. pp. 96–103, 104, 110–118, 143–153. The Argentine law prohibits the exportation of apples without official inspection issuance of such certificates. T.R. p. 104. The evidence adduced through the Argentine fruit inspectors is persuasive of the fact that the apples at the time of loading were properly inspected in accordance with generally accepted procedures and that they were in a suitable condition for transportation and delivery. The Court has evaluated all of the evidence concerning the period of harvesting, the method of harvesting, the railroad transportation from the Rio Negro region to Buenos Aires, the handling of the apples by the truckers, the cold storage of the apples awaiting the arrival of the vessel, the trucking of the apples from the cold storage warehouse to the pier, and the inspections of the apples on the trucks and on the pier. The demonstrated fact is that unsuitable apples were rejected; that only good apples were loaded; the sole exception being approximately one-half truckload of overripe apples.

ventilation equipment. See, e. g., T.R. pp. 1401–1402. At all material times, the cargo was maintained at the proper temperature. There was no significant or deleterious acceleration of ripening. The cargo was discharged in substantially the same state of maturation as it possessed when loaded.

Considered in the light of all the credible evidence, certain testimony (via the Ollivier and Dybeck depositions) introduced by the libellant itself—indicating that 9 percent of the boxes of apples were recoopered on the Buenos Aires pier before loading [12] after having been inspected by the Argentine Government inspectors—does not prove that these recoopered boxes contained bruised fruit.[13]

■ The Court finds [14] that, when loaded at Buenos Aires, the cargo did not contain bruised apples or overripe apples; and that the apples were in good order and condition when the ship left Buenos Aires, except for 250 boxes of overripe apples to which reference will be made in the course of this opinion. The Court also finds that libellant has sustained its burden of proof with respect to bruised apples: the apples were loaded in an unbruised condition but were outturned bruised to the extent hereinafter described.[15]

The cargo of apples was stowed in eight refrigerated holds or compartments identified as 1–A, 1–B, 1–C, 1–D, 2–C, 2–D, 3–B and 3–C, the numbers representing separate hatches and the letters representing deck levels within the holds. T.R. pp. 293, 313, 1375.

12. T.R. pp. 162, 172, 176, 1541–1542; Exh. C (2nd series); Exh. 37.

13. The fact per se that the boxes were recoopered on the Buenos Aires pier prior to loading does not warrant the inference that the apples in the recoopered boxes were bruised. An inference of bruising or no-bruising sought to be drawn from the fact that a box needed coopering depends upon such further circumstances as the direction and amount of force that caused the damage to the box; e.g., an inward or downward thrust directed toward the interior of the box might bruise the fruit, as where boxes are improperly tiered and stowed, whereas an outward pull or tug on the board (as in lifting the box) might loosen or split the slat but not injure the fruit. (E. g., see T.R. pp. 1532–1533.) Furthermore, boxes may be coopered for such relatively minor repairs as where a nail or cleat is missing, a slat cracked or a wireband broken.

In this case, the testimonial evidence is that the loaded fruit was in good condition. For example, the carrier's own professional fruit inspector (Ollivier) told the carrier's representative (Dybeck) and certified in a report that everything was all right with the cargo; that it was good (T.R. pp. 180, 1256, 1257); that the quality was "choice", "well selected and in accordance with its classification". Exhs. 37, C (2nd series); T.R. pp. 181, 183.

14. Except for 250 boxes, the apples were delivered to the ship in good order and condition but redelivered bruised, cut or crushed. The carrier failed to show that such damage was within an exception, statutory or contractual.

The ship's log (Exh. C–2), under date of April 29, 1959, states that overripe apples were discovered on several trucks at the pier. These truckloads were rejected. (See also T.R. pp. 177, 180.) However, one-half truckload of apples from a truck on which overripe apples were found had already been loaded on the ship before overripe apples were discovered on that truck and before the chief officer could object. T.R. pp. 1459–1463. The Court finds that the said half-truckload of apples that were loaded on the ship are the overripe apples that were out-turned in an overripe condition.

The Court finds that the carrier's representatives, who kept themselves continuously informed of the quality of the apples being loaded, knew that one-half truckload (250) boxes of overripe apples were in the stow. These particular cases could not be located on the ship and removed from the reefer compartment; and they were knowingly permitted to remain in the stow on the ship. Exh. C–2, entries for April 29 and 30, 1959; T.R. pp. 1459–1462, 1534–1535, 1537, 1538, 1922, 1924, 1931, 2054. No notation to that effect was put on the bills of lading (Exh. 1; T.R. p. 1538) nor on the mate's receipts. T.R. pp. 1345, 1448.

15. The nature, extent and cause of the damaged boxes and cartons on out-turn and the resultant bruising of the apples therein were fulsomely detailed in the testimony.

Each hatch, measuring about 27 by 16 feet, had a cover consisting of three removal sections or hatch boards, each about 9 feet wide. T.R. pp. 1549, 2344, 2345.

When the ship arrived at the pier of the Harborside Terminal in Jersey City on May 21, 1959, various marine surveyors and cargo inspectors representing the libellant and the carrier were at hand; and, during the ensuing four-day period of discharge (T.R. p. 2390), there was adequate opportunity to observe the state of the cargo (both inside the holds and on the pier) and the manner in which the cargo was being discharged.

A number of witnesses actually saw the cargo in the holds before the discharging stevedores began their work. Those witnesses gave a graphic account of the manner in which the cargo was stowed and the condition of the boxes and cartons on the ship's reefer compartments before they were touched by the discharging stevedores.

On the basis of those eye-witness accounts which the Court considers to be reliable, the Court finds the following:

The boxes and cartons were in tiers, ranging from three to seven tiers. T.R. pp. 296–303, 304, 307. Dunnage or battening was between every other tier of the boxes, and between every tier of the cartons. T.R. pp. 296–298, 313, 367, 566. However, the dunnage or battening was placed haphazardly and at random. T.R. pp. 296–298, 308, 331, 367, 395, 613.

The dunnage strips should have been placed regularly over the headboards or strong ends of the boxes. T.R. pp. 313, 1013.

The boxes and cartons were stacked in a zigzag, haphazard, overlapping or "checkerboard" manner. T.R. pp. 296–298, 313, 410–411, 486, 496, 514, 551, 554, 556, 571, 608–609. About 70 percent of the boxes were not stowed box on box. T.R. p. 369.

The boxes should have been arranged so that each box was horizontally and directly over the box below—"box on box, strength on strength"—so that the thick and strong ends of each box would be over corresponding thick and strong ends of the box below, thereby protecting the containers against breakage and movement during the voyage. T.R. pp. 451, 1008–1009, 1031, 2050–2052.

When the proper method of tiering is not used—and especially where, as here, the dunnage is likewise irregular—the thick and strong ends of the upper boxes crack or break the thinner slats or boards of the lower boxes. When the rows of the boxes are not uniformly horizontal, box on box, the pressure of the weight of the tilted boxes on top is thrust diagonally into the thinner slats of the lower boxes, thus breaking and bending those slats and bruising the fruit. T.R. pp. 1030–1031, 1039, 1040.

When viewed in the holds, the boxes and the cartons reflected their improper stowage. Some of the cartons were indented both on top and bottom and had sagged over the battens; and some cartons were crumpled, squeezed, creased and partly crushed. T.R. pp. 296–398, 313, 610, 1761. Some of the boxes had slats that were splintered; and some of the boxes were split, broken or distorted. T.R. pp. 308, 315, 349, 610, 1727, 1756, 1780.

Experienced cargo inspectors estimated that about 10 percent of the total or 4,000 to 4,500 containers (in the stow before the stevedores touched them) were pushed out of shape or had broken boards or splintered slats; and they described this as a general condition. McCabe, T.R. pp. 610, 620–622, 644, 772, 773, 808–813; Barefield, T.R. pp. 860–867, 889; Robertson, T.R. pp. 1727, 1756, 1780. The superintendent of the respondent-stevedore described the extent of boards broken off the boxes before the stevedores began working as a general condition throughout the stow. T.R. p. 2368.

The foregoing conditions existing in the holds before the discharging stevedores began to work were aggravated by the method of the discharging operations. One witness estimated that such aggravation amounted to a 25 percent increase in

bruising. T.R. pp. 620, 683, 684, 825, 844.

The proper method is to remove either all hatch boards or at least more than one hatch board or section of the hatch cover. T.R. pp. 356, 357, 845, 931, 994, 996, 997, 2348.

However, in an effort to retain the coolness in the holds during the warm weather that then prevailed (T.R. pp. 1730, 1731), the ship's chief officer (who had and exercised controlling authority [T.R. pp. 993-994, 2343]) overruled the stevedores and gave instructions that only one section of the hatch covers be removed. T.R. pp. 2349, 2359-2361, 2383. Only one section in each hatch cover was removed during the discharge. T.R. pp. 308-309, 356-357, 482, 484, 620, 931, 994, 996, 997, 1075, 1078, 1082, 1731, 1732, 2348, 2365.

As a result of the removal of only one section of the hatch cover, the working area was narrowed and rendered inadequate; and the stevedores were prevented from using (as they should have used) walking boards when walking on top of the containers. Consequently, the stevedores walked on the upper tiers of the containers until they could otherwise work the cargo; drafts of the boxes and containers sometimes hit the hatch-coaming and beams left in the hatchway; and thus further damage was inflicted on the containers and their contents. T.R. pp. 308, 309-310, 312, 359, 401, 470, 482-483, 488, 491, 492, 496, 504, 575, 578, 619, 620, 637, 644, 683, 684, 686, 810, 812, 813, 821, 822, 823, 825, 844, 1002, 1728, 1768, 1770-1773, 2350, 2351, 2352-2353, 2368, 2372, 2374, 2375.

When the cargo was finally discharged, respondent-carrier delivered 43,169 containers, the full quantity that had been shipped. Exhibits U (2nd series) and T (2nd series). Any indication of a short delivery [see Exhibits I (2nd series) and W (3rd series)] is attributable to tally errors at the time of delivery. However, a large number of boxes were found to be broken, split and damaged. Exh. A (3rd series); Exhs. 62-64; T.R. pp. 1119; 2532, 2541, 2545,

2550, 2552. A substantial quantity of the apples were bruised. T.R. pp. 308, 315, 323, 325, 478, 502, 503, 512. This condition was described by some witnesses as "general" bruising (T.R. pp. 502, 503, 620, 621, 622, 644, 772, 773, 808-813) and as averaging from 40 to 50 percent in various degrees of bruising in all the holds and in every box. T.R. pp. 620, 637, 644, 792, 794, 809, 834, 835, 859.

Three thousand one hundred sixty-nine boxes had to be and were recoopered. T.R. pp. 2529, 2532, 2541, 2545, 2552; Exhibits 62-64.

Proctor for the carrier conceded that the breakage of 9 percent to 10 percent of the boxes is very high. T.R. p. 2231. See also T.R. pp. 1531, 1636-1637.

The above-described conditions and extent of bruising to the fruit were confirmed by what the United States official inspectors (Partridge and Whatley) found when they examined the apples in the Harborside Terminal refrigerated warehouse.

They conducted a "condition inspection" by making representative, random samplings of about sixty containers in each storage lot of the apples on May 27 and 28, 1959 in the Harborside Terminal warehouse. T.R. 1216, 1217, 1241. Their reports, consisting of twelve certificates (Nos. F5379-F5387, F5389-F5391) are Exhibit X (T.R. p. 1219).

The findings in the Partridge-Whatley certificates are adopted by the Court.

These certificates show the following conditions of bruising:

*Certificate No. F5379*

The lot examined consisted of approximately 7,000 wooden boxes and approximately 1,500 fibreboard boxes. Partridge found: "Samples generally range from 4 to 88%, in few none, average approximately 20% damage by bruising occurring throughout pack."

*Certificate No. F5380*

The lot examined consisted of 2,000 boxes. Partridge found: "Damage by bruising ranges in most samples from 4

to 35%, in some none, average approximately 12% occurring throughout pack."

*Certificate No. F5381*

The lot examined consisted of 1,685 boxes. Partridge found: "Damage by bruising ranges in most samples from 4 to 48%, in many none, average approximately 10% occurring throughout pack."

*Certificate No. F5382*

The lot examined consisted of 3,665 boxes. Whatley found: "Samples generally range from 4 to 65%, few samples none, average approximately 15% damage by bruising occurring throughout pack."

*Certificate No. F5383*

The lot examined consisted of 6,695 boxes. Whatley found: "Samples generally range from 4 to 60%, few samples none, average approximately 15% damage by bruising occurring throughout pack."

*Certificate No. F5384*

The lot examined consisted of 3,305 boxes. Whatley found: "Samples generally range from 4 to 55%, few none, averaging approximately 15% damage by bruising occurring throughout pack."

*Certificate No. F5385*

The lot examined consisted of 663 boxes. Whatley found: "Samples range from 4 to 40% averaging approximately 14% damage by bruising occurring throughout pack."

*Certificate No. F5386*

The lot examined consisted of 949 boxes. Partridge found: "Damage by bruising ranges in most samples from 4 to 16%, in many none, average 6% occurring throughout pack."

*Certificate No. F5387*

The lot examined consisted of 1,068 boxes. Whatley found: "Damage by bruising in most samples range 4 to 50%,

many none, average approximately 11%, occurring throughout pack."

*Certificate No. F5389*

The lot examined consisted of 7,340 boxes. Partridge found: "Samples generally range from 4 to 50%, few none, averaging approximately 15% damage by bruising, occurring throughout pack."

*Certificate No. F5390*

The lot examined consisted of 5,000 boxes. Partridge found: "Samples generally range from 4 to 35%, few samples none, average approximately 11% damage by bruising, occurring throughout pack."

*Certificate No. F5391*

The lot examined consisted of 2,163 boxes. Partridge found: "Damage by bruising ranges from 4 to 35%, average approximately 20% occurring throughout pack."

The average extent of bruising set forth in the twelve certificates amounts to approximately 14 percent. Since "bruising" is a general term and may encompass a variety of conditions having varying effects on the commercial value of the bruised fruit, the translation of the statistic of 14 percent bruising into damages is a proper subject of inquiry by the commissioner to be appointed herein.

Turning now to the subject of "overripe" as distinguished from "bruised" apples, the Court finds that, with the exception of 250 boxes of overripe apples, the apples on out-turn were in good condition in terms of maturity; more specifically, they were ripe and firm ripe, as reported by Partridge and Whatley.[16]

This finding is grounded primarily upon the direct evidence furnished by the credible and persuasive testimony given in open court by the two experienced United States Department of Agriculture fruit and vegetable inspectors,[17] the

---

16. The reports of the federal inspectors state that less than one percent of the apples showed signs of decay. Exh. X. For a shipment of 43,169 containers of apples this is normal. T.R. p. 869.

17. Partridge had had eleven years' experience (T.R. pp. 1215–1216) and Whatley

had had six years' experience (T.R. p. 1243) in testing and inspecting fruits and vegetables, at the time they inspected the cargo involved in this case.

Partridge testified, and signed twelve certificates (Exh. X) attesting, to the fact that the apples were "mostly ripe

only disinterested witnesses on this issue.[18] Partridge and Whatley impressed the Court as motiveless and trustworthy.

These two federal inspectors examined one-half of one percent of the entire shipment of 43,169 containers of apples.[19] The competency of their examination and the persuasiveness of their findings are not attenuated by the testimony of several other witnesses (each of whom was interested) that they found soft, mealy and overripe apples when they inspected the cargo on discharge.[20]

The direct evidence supplied by Partridge and Whatley is buttressed by the circumstantial evidence (accepted by the Court as credible) that the apples when loaded on the ship in Buenos Aires were not overripe nor otherwise in bad condition and that the refrigeration facilities of the ship indisputably were adequate and efficient in design, construction and operation.

However, the Court finds that 250 boxes of apples were out-turned mealy and overripe.[21] These 250 boxes are traceable to the one-half truckload (i. e., about 250 boxes) of overripe apples that—to the knowledge of the carrier—were loaded at Buenos Aires.

to firm ripe" and that he did not find any overripe or mealy apples. T.R. pp. 1219–1220.

When asked to define these terms, Partridge answered "[A] ripe apple is one that is fairly firm. When you cut it with a knife there is practically little or no snap. When you chew the flesh they are juicy and disintegrate very readily in your mouth leaving practically no residue. A firm ripe apple is a little firmer to the feel. It cuts with a little snap and when you chew this apple it leaves more residue in your mouth. It doesn't chew up as readily." T.R. p. 1233. "An overripe apple is soft, mealy, practically no juice, * * *." T.R. p. 1234.

Whatley testified that, if he were asked the same questions as had been asked of Partridge, he would give substantially the same answers. T.R. p. 1244.

18. Others who testified about the condition of the apples on out-turn were McCabe, Moreland, Barefield, Lombardo, Robertson and Parry. Parry (T.R. p. 315), Moreland (T.R. p. 386), McCabe (T.R. p. 605) and Barefield (T.R. p. 848) were employed by libellant to inspect the cargo on its arrival. Lombardo was a customer of libellant. T.R. p. 2165. Robertson was the carrier's surveyor. T.R. p. 1698.

19. This fact does not invalidate the competency of the inspectors' reports and findings. The adequacy of their methods of sampling and examination was not put in issue. In response to the question put to him on cross-examination "You consider that sufficient to reach a determination as to the general condition of the entire shipment?", Partridge answered, "Yes, sir." T.R. p. 1226.

Dybeck, one of the carrier's representatives, testified on cross-examination by libellant that whether an inspection of one-half of one percent is adequate to determine the condition of this cargo "depends very much how the inspection is carried out." T.R. pp. 1540–1541. Cf. Pinto's inspection of between one to two percent. T.R. pp. 12, 15.

The Court finds that the two federal inspectors did conduct an appropriate inspection and that their test-sampling was sufficiently random and representative to serve as the basis for their reported findings.

20. McCabe and Lombardo testified that they found overripe apples. T.R. pp. 703, 2161. On the other hand, Barefield and Robertson testified that they did not observe any overripe apples. T.R. pp. 895, 1723.

Barefield, Moreland, McCabe, Parry and Lombardo testified that they found mealy apples. T.R. pp. 328, 574, 703, 863–865, 2161–2163. Robertson testified that he did not "think" that the apples were mealy. T.R. p. 1724.

The overwhelming weight of the believable evidence demonstrates (and the Court so finds) that the cargo (except for 250 boxes) was in the proper state of maturity (ripe and firm-ripe) when loaded and that the ship was, in all respects, adequately refrigerated and ventilated to prevent any significant acceleration of maturation en route.

21. This finding does not materially impeach or undercut the findings reported by the two federal inspectors. These particular 250 boxes of overripe and mealy apples (see footnote 14, supra), comprising about one-half of one percent of the total cargo of 43,169 containers, were not detected among those that were test-inspected at the Harborside Terminal Warehouse, where the cargo was warehoused after discharge from the ship.

Generally speaking, a demonstration by the carrier that the cargo (in this case, a portion of the cargo amounting to 250 boxes) was not in good order and condition when loaded overcomes the effect of libellant's prima facie case and thereby defeats recovery *pro tanto*. Cf. 46 U.S.C. § 1304(2) (m).

However, the carrier's issuance of eight clean bills of lading, after the carrier gained actual knowledge that one-half a truckload [22] of overripe apples had been loaded on the vessel, estops it from now asserting that the apples in the 250 boxes were not in good order and condition when loaded. General Foods Corp. v. The Felipe Camarao, 172 F.2d 131, 133 (2d Cir. 1949), cert. denied, Republic of United States of Brazil v. General Foods Corp., 337 U.S. 908, 69 S.Ct. 1047, 93 L.Ed. 1720 (1949); The Robin Gray, 65 F.2d 376, 378 (2d Cir. 1933), cert. denied, Seas Shipping Co. v. Approximately 3,251,000 Feet Board Measure, 290 U.S. 653, 54 S.Ct. 70, 78 L.Ed. 566 (1933); The Carso, 53 F.2d 374, 378 (2d Cir. 1931), cert. denied, Navigazione Libera Triestina v. Molinelli Giannusa & Raco, Inc., 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574 (1931).

Consequently, the carrier is liable as to the 250 cases of apples which were loaded and thereafter out-turned in mealy and overripe condition.

In an attempt to escape from the operation of the estoppel arising out of the issuance of clean bills of lading, the respondents contend that the libellant itself is precluded from asserting the estoppel theory because that estoppel contention was not formulated as an issue in the pretrial order. The pretrial order shows that libellant claimed the goods to have been in good order and condition when loaded whereas, as already noted, in libellant's post-trial proposed findings of fact (Libellant's Proposed Findings of Fact After Trial Nos. 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 32) libellant has adopted as an alternative theory the claim that the apples were mealy and overripe when loaded. The carrier claims to be both surprised and prejudiced by this claim.[23]

A realistic appraisal of the particular circumstances existing in this case justifies the conclusion that the libellant should not be precluded from asserting that the carrier is estopped from claiming a state of cargo that contradicts its own representation in its eight clean bills of lading of apparent good order and condition.

The attempt to prove that the apples were overripe and bruised before they were loaded was made by the respondents themselves.

In its direct case libellant was the protagonist of the position that the pre-loading condition of the apples was good. However, after the respondents sought to prove that the pre-loading condition of the cargo was overripe and damaged, libellant should be permitted to adopt the tactic of accepting (at least arguendo) the respondents' version of the facts and contending that the respondents are estopped from impeaching the clean bills of lading. These are but "the twists and turns of advocacy." Maitland, Introduction To The Year Books (1903), reprinted in Delany, The Maitland Reader, p. 146 (1957).

In a somewhat analogous situation (though the present case does not involve fraud) the court in Higgins v. Anglo-

---

22. The Court finds that, on the average, 250 boxes comprise one-half truckload. Different witnesses gave varying estimates of the number of boxes making up a full truckload: Pinto, T.R. p. 15 [200 to 400]; Coloma, T.R. p. 226 [500]; Del Signo, T.R. p. 226 [200 to 700]; Giordano, T.R. p. 226 [300 to 400]; Dieguez, T.R. p. 226 [400 to 500].

23. At the trial, proctor for the carrier stated that, had he been put on timely notice of this estoppel theory, he would have called the master to testify personally. T.R. p. 2287. The Court offered the carrier full opportunity to call any further witnesses it deemed necessary. T.R. pp. 2288, 2576. This opportunity was declined. T.R. pp. 2620–2621.

Algerian S.S. Co., 248 F. 386, 389 (2d Cir. 1918), pointed out:

"The respondent insists that, as the libel is founded on contract on the bill of lading, nothing being said about fraud, it would be allowing the libelants to recover on a new and different cause of action if the case were disposed of on that ground. The answer is the respondent itself introduced all the evidence showing the fraud."

While Higgins antedates the procedural device of pretrial orders, its rationale is nonetheless applicable to the circumstances disclosed in the case at bar.

Since the Court has found that the cargo was in good order and condition in all respects when loaded (except with respect to the approximately 250 boxes), the maximum impact of the estoppel asserted by the libellant against the respondent-carrier and the preclusion asserted by the respondent-carrier against the libellant would affect only 250 boxes. As to these 250 boxes, the carrier knew that they contained overripe apples. It was the carrier itself who brought this fact out at the trial. In the circumstances, the Court does not sustain the carrier's argument that the libellant cannot utilize the facts brought out by the carrier.

A defense theory was that this action represents an attempt by the libellant to recoup losses that it had sustained on this apple cargo solely because of a radical deterioration in the market price of these apples after April. T.R. pp. 1103, 1142–1143; 1165; 1167–1168; 1173–1178; 1303. This theory was sought to be established circumstantially by evidence that the imported apples had to remain in quarantine in the Harborside Warehouse, a cold storage warehouse for sterilization purposes (T.R. p. 1083) after the cargo was discharged from the ship;

and that there was a drastic and continuing decline in the market price of domestic and imported apples throughout May and June 1959. T.R. pp. 436–438, 464–465, 1098–1100, 1119, 1124–1125.

Regardless of libellant's economic motivation in suing, the great weight of the credible evidence proves that the respondent-carrier's negligence was the proximate cause of injury and loss to the libellant for which it is entitled to compensatory damages.[24]

The following enumerated findings of fact and conclusions of law are additional to and in amplification of the findings and conclusions expressed in the course of the foregoing opinion.

### FINDINGS OF FACT

1. At all material times, libellant was and now is a corporation duly organized and existing under and by virtue of the laws of the State of New York, with an office and principal place of business at 307 Washington Street, New York City.

2. At all material times, respondent A/S Falkefjell Og A/S Dovrefjell was and now is a foreign corporation and the owner of the S.S. "NOREFJELL", a refrigerated cargo ship.

3. At all material times, respondent Sud America Terrestre y Maritima Compania de Seguros Generales was and now is a foreign insurance company, with a principal office and place of business at Buenos Aires, Argentina.

4. At all material times, respondent Maher Stevedoring Co. was and now is a domestic corporation, with a principal office and place of business at 80 Broad Street, New York City, and engaged in general stevedoring work in the port of New York.

5. The Red Delicious fresh apples that became libellant's cargo were harvested during February and March, 1959, in the Rio Negro Valley of Argentina,

24. As to the allegedly relevant market price and the allegedly frustrated resale of the fruit, see Levatino, T.R. pp. 1098–1100, 1103, 1119, 1122, 1124, 1125, 1134, 1139–1143, 1146–1157, 1160–1180; Tem-

pleton, T.R. pp. 2074–2078, 2087, 2090, 2091, 2095, 2098; Lombardo, T.R. pp. 2161, 2164, 2179; Moskowitz [by stipulation], T.R. pp. 2427–2429; Exh. A (4th series), T.R. p. 2564.

which is about 800 miles from Buenos Aires.

6. The cargo consisted of a total of 43,169 containers of such apples. Some of the containers were wooden boxes, the number of such boxes being 42,115. Some of the containers were fibreboard cartons, the number of such cartons being 1,054.

The wooden boxes in which the apples were packed measured 19½ inches long by 11½ inches wide by 12½ inches high in the bulge. The ends of the boxes were strong and solid. The sides were thinner boards. The top and bottom pieces were thin laths, cleated at each end, with ventilating spaces between the laths.

7. The apples that were packed in wooden boxes were individually wrapped in sulphite paper and placed tightly in the boxes which were lined with corrugated paper. The boxes were filled in such a manner that, as each lid was nailed on, a small bulge was created in the middle of the lid.

8. The apples that were packed in the 1,054 fibreboard cartons were individually wrapped in sulphite paper and were enclosed in individual cell-like cardboard compartments within each of the cartons.

9. The apples were wrapped and packed sufficiently and properly in boxes and cartons in good workmanlike manner; and the said containers were of sufficient structure and strength to ensure the safety and protection of their contents with respect to all reasonably anticipated conditions of handling and stowage, throughout all stages of transportation, loading and discharge.

The respondent carrier's defense of insufficiency of packing is without merit in point of fact and law.

10. The boxes and cartons were of the customary type. The boxes were constructed and the apples packed therein in accordance with the applicable regulations of the Argentine Government.

11. Neither libellant nor the American Trust Company was present in Buenos Aires at the time the ship was being loaded. Libellant did not see the apples until their discharge at New York.

12. On April 28, 29 and 30, 1959, at the port of Buenos Aires, Argentina, there were delivered to respondent-carrier, as a common carrier, the aforementioned 43,169 containers of Red Delicious fresh apples for shipment on the S.S. "NOREFJELL" in refrigerated compartments, to the port of New York, there to be delivered to the order of American Trust Company, notify libellant.

13. Eight bills of lading covering the said 43,169 containers were duly signed and issued ashore by the authorized agent of the respondent-carrier.

14. The said eight bills of lading each contain the recital that the boxes of apples were received in "apparent good order and condition." The said bills of lading contained no notation of any damage to the containers or their contents.

15. Prior to the issuance of the said bills of lading, libellant and its shipper entered into a written contract of sale for the said 43,169 containers of apples.

16. Prior to the issuance of the said bills of lading, libellant had established two letters of credit with American Trust Company, New York, in the total sum of $85,000, to pay the shipper for the said apples. The two letters of credit specified, among other conditions for payment, that the bills of lading must be clean.

17. Payment to the shipper of the sums due under the said contract of sale were made by said American Trust Company, prior to the arrival of the ship at New York, from funds provided by the aforesaid letters of credit, upon the shipper's presentation of the aforementioned eight clean bills of lading; the last payment having been made on May 11, 1959, about ten days before the ship started to discharge.

18. Subsequent to said payment to the shipper, the said bills of lading were endorsed to libellant, who became the holder thereof. The shipper repaid no part of the purchase price received from

the sale of the 43,169 containers of apples.

19. On May 21, 1959, the date the ship started to discharge, libellant paid Garcia & Diaz, the ship's New York agents, the sum of $99,911.43 for ocean freight charges.

20. While the ship was being loaded at Buenos Aires, the respondent-carrier's representatives (including its representative who signed the eight clean bills of lading herein on behalf of the ship and the carrier) learned that several trucks on the pier were loaded with containers of overripe and soft apples. These trucks and their loads were sent back to the refrigerated warehouses. However, one-half truckload of boxes from one of those trucks containing overripe, soft apples had been stowed on the ship; and the said representatives of the respondent-carrier knew that fact.

21. An average full truckload consists of approximately 500 containers of apples.

22. Said representatives of the respondent-carrier knew that approximately 250 boxes of overripe, soft apples had been stowed on the ship and not removed therefrom prior to sailing.

23. Despite the knowledge on the part of the respondent-carrier's representatives that 250 boxes of overripe, soft apples had been loaded on the ship, said representatives did not note exceptions on any of the eight bills of lading, which acknowledged receipt of the apples on board in apparent good order and condition. That acknowledgment and recital was erroneous to the extent that 250 boxes of overripe, soft apples had been stowed on the ship and not removed therefrom prior to sailing, as more particularly set forth in Findings "20" to "22", supra.

24. On out-turn, 250 boxes of apples were overripe, soft and mealy.

25. The ship's master saw the bills of lading and was given copies of the said bills of lading before the ship sailed.

26. Libellant was a holder for value of the bills of lading, without notice that the ship had sailed from Buenos Aires with 250 boxes of the apples covered by said bills of lading in an overripe, soft condition.

27. The S.S. "NOREFJELL" is a modern reefer ship, built in 1956. At all material times, she was seaworthy with respect to the equipment and machinery required to properly cool and ventilate all cargo compartments.

28. The S.S. "NOREFJELL" had an advanced system of air circulation whereby cold air, forced by powerful fans, was introduced under a grating which covered the entire deck area, and was forced up vertically through the cargo to the top. The forced draft cooling system employed on the ship required no special air channels within the stow. The overhead space above the cargo was on the average about six inches and was adequate to draw off the return air.

29. The S.S. "NOREFJELL" circulated cold air throughout the compartments as soon as the apples were loaded, and brought them down to the desired carrying temperature of 32–33°F within six to eight hours. That temperature was maintained properly and adequately in all respects throughout the voyage in the compartments containing the apples for New York.

30. There was adequate and proper circulation of cool air among the boxes and cartons. Apples of the variety comprising libellant's shipments will remain in sound condition in refrigerated storage from nine months to one year. The ship provided adequate refrigerated storage and stowage.

31. Surveyors at New York took pulp temperatures throughout the stow which averaged 32–33°F, maximum 34°, and confirmed the absence of any pockets of heat and established that there was proper circulation of cooling air during the voyage.

32. On out-turn, and except as found in Finding "24", the apples were mostly ripe and firm ripe. Decay averaged less than one percent, which was normal and expected.

33. When loaded at Buenos Aires, the cargo did not contain bruised apples.

34. The cargo of apples was stowed in the following eight reefer compartments of the ship: 1–A, 1–B, 1–C, 1–D, 2–C, 2–D, 3–B and 3–C.

35. (a) The respondent-carrier's method of stowage of said cargo in the said reefer compartments was not in accordance with generally accepted and customary standards and procedures which required the boxes to be tiered horizontally, box on box, with the stronger and thicker ends or boards of each box directly over the corresponding stronger and thicker ends or boards of the box underneath without overlapping and with battening or dunnage between every other tier of boxes but placed regularly between the boxes over the stronger and thicker ends or boards of the boxes.

(b) The respondent-carrier's method of stowage of said cargo in the said reefer compartments was negligently improper and represented lack of due and prudent care by the respondent-carrier and its offices, agents, employees and servants with respect to the physical safety and security of the boxes and cartons and their contents.

(c) The aforesaid improper and negligent method of stowage caused container damage and breakage and apple bruising (as more particularly set forth hereinafter) but it did not significantly and adversely affect the ventilation and cooling of the cargo. The boxes functioned like sieves and possessed a substantial amount of self-ventilation. The stowage was not tight and solid but possessed an adequate amount of vertical and horizontal air channels. The circulation of cool air required for the preservation of the apples was neither blocked nor impeded nor interrupted by the stowage or by any other condition. The stowage did not cause or contribute to cause any ripening or mealiness of the apples.

36. (a) As the proximate result of the respondent-carrier's aforesaid improper and negligent stowage, approximately 3,200 boxes and an undetermined number of cartons were broken, pushed out of shape and otherwise physically damaged and the apples in such containers were bruised.

(b) Many of the containers of apples that were not broken also contained bruised apples. This bruising was caused by pressures brought to bear on the apples as the proximate result of the improper stowage and of the stevedores' walking on the containers in the course of discharge.

(c) The percentage of apples that were bruised in both the broken and unbroken containers was 14 percent of the total amount of the apples comprising the cargo belonging to libellant.

37. The respondent-stevedore was employed by the respondent-carrier to discharge cargo from the ship at the port of New York, including that of libellant's eight shipments of apples.

38. The discharge of the ship was made under the supervision and control of the ship's master and chief officer who remained in charge and who directed and supervised the discharge procedure.

39. (a) To the extent that it was not prevented by the respondent-carrier from doing so, the respondent-stevedore performed the cargo discharge operations in a reasonably careful, prudent and workmanlike manner.

(b) Whatever injuries were physically inflicted upon the containers and their contents during the course of the discharge operations are attributable solely to the fact that only one section of the hatch covers were permitted by the ship's representatives to be removed although the stevedore had requested that the three sections be removed; and, as a result, the stevedore's employees were not afforded reasonably adequate and proper working space and place. By virtue of the foregoing improper conduct on the part of the ship's representatives, the stevedore's employees were required to walk on a portion of the containers without the use of walking boards and some drafts of the cargo hit the hatch coaming and beams left in the hatchway.

40. Respondent-carrier discharged and delivered 43,169 containers, the full quantity that had been placed on board at Buenos Aires.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of each of the consolidated actions.

2. Libellant was the owner of the cargo in suit.

3. The rights of libellant and the respondent-carrier and the vessel are governed by the U. S. Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315.

4. (a) Libellant has established its right of recovery against the respondent-carrier, the vessel, and the respondent-underwriter for compensatory damages with respect to that portion of the out-turned cargo which was bruised, cut or crushed.

(b) Libellant's cargo was contracted to be given refrigerated stowage. The respondent-carrier properly performed its contractual duty to give libellant's cargo refrigerated stowage. The respondent-carrier gave the cargo proper and adequate ventilation and refrigeration in accordance with the needs and nature of the cargo.

5. The rights of libellant against the respondent-underwriter are governed by the contract of insurance between them, which covers damage (including damage caused by breakage) occasioned by negligence of the ship's master, officers and servants or by negligence in stowage.

6. The injury to that portion of the cargo which was out-turned in a bruised, cut or crushed condition was proximately caused (a) by the ship's negligent stowage of the cargo and (b) by the negligence of the ship's officers in directing that only one section of each of the hatch covers be removed during the cargo discharge, thereby depriving the employees of the respondent-stevedore of adequate working space and place and preventing them from utilizing proper methods and procedures in unloading the cargo.

7. (a) The loss and damage sustained by the libellant as a result of the bruised, cut or crushed condition of the out-turned apples were insured by the contract of insurance between the libellant and the respondent-underwriter; and the latter is liable to the former in the amount of such loss and damage.

(b) If the amount of damages recoverable by libellant from the respondent-carrier and its ship is larger than the amount of damages recoverable by libellant from respondent-underwriter under the said contract of insurance, such difference is recoverable from respondent-carrier and the ship.

8. The respondent-underwriter has established its right of recovery over against the respondent-carrier and the ship with respect to the loss and damages referred to in Conclusion No. "7", on the basis of subrogation to the libellant's rights against the respondent-carrier.

9. Libellant has established its right of recovery against the respondent-carrier and the ship for compensatory damages with respect to two hundred and fifty boxes of apples that, to the respondent-carrier's knowledge, were loaded on the ship in a soft, mealy and overripe condition and whose presence in the loaded cargo was not noted on any of the bills of lading issued by the respondent-carrier.

10. Respondent-stevedore is not liable to any of the parties herein.

11. Libellant is entitled to an interlocutory judgment for the damage by bruising, cutting and crushing and the 250 boxes of overripe and mealy apples, with reference to a special commissioner to ascertain and report the amount thereof.

_____

This opinion sets forth the numbered and unnumbered findings of fact and conclusions of law. If any party desires additional or supplemental findings or conclusions consistent with the foregoing opinion, findings and conclusions, they may be submitted upon ten days' notice.

The Court, having deemed it expedient for the purposes of justice, pursuant to Rules of Practice In Admiralty And Maritime Cases, Rule 43, refers the matter of the ascertainment of the amount of libellant's damages to a special commissioner, to be appointed by the Court, to hear the parties and make a report therein. The issues so to be heard by the commissioner shall be framed in the interlocutory judgment herein.

Submit interlocutory judgment in accordance with the foregoing opinion, findings and conclusions upon ten days' notice.